THE NORTHERN TRUST COMPANY, TRANSFEREE AND TRUSTEE; ARTHUR L. SIMON, TRANSFEREE AND TRUSTEE; AND JEFFERY J. SIMON, TRANSFEREE AND TRUSTEE, ET AL.,[1] PETITIONERS v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 6859-80, 21439-80, Filed August 11, 1986.
21440-80, 21441-80,
21442-80.

*William H. Pokorny, Jr.*, and *James A. Clark*, for the petitioners.

*Thomas C. Borders* and *Luanne D. Dimauro*, for the respondent.

NIMS, *Judge*: Respondent determined a deficiency of $154,683.45 in the Federal estate tax of petitioner, the Estate of Cecilia C. Simon.[2] Respondent determined the following deficiencies in other petitioners' Federal gift taxes:[3]

| Docket No. | Calendar quarter ending | Petitioner | Deficiency |
| --- | --- | --- | --- |
| 21439-80 | June 30, 1976 | John H. Curran | $131,777.60 |
| 21440-80 | June 30, 1976 | William Curran | 131,777.60 |

[1]Cases of the following petitioners are consolidated herewith: John H. Curran, docket No. 21439-80; William Curran, docket No. 21440-80; Patricia A. Curran, docket No. 21441-80; and Linda R. Curran, docket No. 21442-80.

[2]In the notice of deficiency issued to the Estate of Cecilia Simon, respondent determined a Federal estate tax deficiency of $184,388.90. On Feb. 20, 1985, respondent filed an amended answer in which he reduced the alleged estate tax deficiency from $184,388.90 to $154,683.45.

[3]John Curran and Linda Curran, husband and wife, and William Curran and Patricia Curran, husband and wife, made timely elections under sec. 2513(a) (gift by husband or wife to third party). Pursuant to sec. 2513(a), each gift is deemed to have been made one-half by the husband and one-half by the wife.

| Docket No. | Calendar quarter ending | Petitioner | Deficiency |
|---|---|---|---|
| 21441-80 | June 30, 1976 | Patricia A. Curran | $131,777.60 |
| 21442-80 | June 30, 1976 | Linda R. Curran | 131,777.60 |

The issue for decision is the fair market value of 6 shares of class A common voting stock and 2,300 shares of class B nonvoting common stock of Curran Contracting Co. held respectively by petitioners John Curran, William Curran, and the Estate of Cecilia Simon on May 7, 1976 (see note 21).

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference.

Cecilia Simon died a resident of Illinois on May 11, 1976. Petitioners John H. Curran and Linda Curran, husband and wife, and petitioners William Curran and Patricia Curran, husband and wife, resided in Illinois at the time their respective petitions were filed.

Petitioners John Curran (John) and William Curran (William), together with their sisters Cecilia Simon (Cecilia) and Judy Pokorny (Judy), were the sole shareholders of Curran Contracting Co. (CCC), a Delaware corporation engaged in the asphalt paving business. CCC had been incorporated in December 1975, as part of an overall plan of reorganization of several companies owned by members of the Curran family. The reorganization of the Curran family companies occurred as follows:

Prior to the incorporation of CCC, John, William, Cecilia, and Judy, together with their cousin Henrietta Johnston (Henrietta), owned all of the issued and outstanding stock of Suburban Oil Co. (Suburban) and H.J. Curran Contracting Co. (HJCCC) as follows:

| Shareholder | Stock ownership | |
|---|---|---|
| | Suburban | HJCCC |
| John | 144 shares of voting common | 148 shares of voting common |
| William | 144 shares of voting common | 148 shares of voting common |

| Shareholder | Stock ownership | |
| | Suburban | HJCCC |
| --- | --- | --- |
| Cecilia | 142 shares of voting common | 146 shares of voting common |
| Judy | 142 shares of voting common | 146 shares of voting common |
| Henrietta | 16 shares of voting common | 3,520 shares of preferred |

Suburban was the parent company directly or indirectly of Holland Co. (Holland) and Holland Railway Equipment, Ltd. (Holland, Ltd.). HJCCC was the parent company directly or indirectly of Stahl Construction Co. (Stahl), Curran Development Corp. (Curran Development), and Kaneland Construction Co. (Kaneland).

As the first step in a reorganization of the above companies, Suburban merged[4] with HJCCC. To effect this merger Suburban redeemed the 16 shares of Suburban common stock owned by Henrietta for $3,730 per share. The remaining shareholders then contributed their shares of Suburban common stock to HJCCC, where it was included in the paid-in capital surplus account of that company.

Subsequent to the merger of Suburban and HJCCC, HJCCC redeemed the 3,520 shares of HJCCC preferred stock owned by Henrietta for $30 per share. HJCCC then merged with CCC. Pursuant to the terms of the merger, John, William, Judy, and Cecilia received the following shares of CCC stock:

| Shareholder | Shares of stock owned |
| --- | --- |
| John | 6 shares class A voting common |
| | 2,300 shares class B nonvoting common |
| | 1,960 shares nonvoting preferred |
| William | 6 shares class A voting common |
| | 2,300 shares class B nonvoting common |
| | 1,960 shares nonvoting preferred |
| Judy | 6 shares class A voting common |
| | 2,300 shares class B nonvoting common |
| | 1,933 shares nonvoting preferred |
| Cecilia | 6 shares class A voting common |
| | 2,300 shares class B nonvoting common |
| | 1,933 shares nonvoting preferred |

---

[4]The parties use the term "merger" in referring to the corporate combinations described herein, and we have accordingly, for convenience, adhered to that practice.

Each share of CCC preferred stock provided for a noncumulative dividend of $80. At the time of the reorganization, CCC had adequate earnings to pay these dividends. The Curran companies, however, had historically paid very small dividends and at the time of the reorganization, CCC's board of directors did not intend to pay dividends on CCC's preferred stock. The past and present management of CCC believed that profits should be reinvested in the business rather than paid out as dividends.

Moreover, the preferred shareholders of CCC could not compel the company to redeem their stock. The board of directors of CCC, however, could call the preferred stock at a charter specified redemption price of $1,000 per share. John and William intended to cause CCC to redeem their preferred shares at the time of their respective deaths for an amount that would produce sufficient income to pay the living expenses of their surviving spouses. They also intended to redeem the preferred shares owned by Cecilia and Judy at the time of each of their husband's deaths for an amount that would produce sufficient income to pay the living expenses of Cecilia and Judy. John and William did not intend to redeem the preferred stock for the stated price of $1,000 per share.

After the merger of CCC and HJCCC, John became CCC's president and chairman of its board of directors. William became CCC's vice president and a member of its board of directors. Jim Johnston, a cousin of John and William, served as CCC's secretary and as the third and final member of its board of directors.

As a result of the merger of HJCCC with CCC, CCC became the parent company directly or indirectly of Stahl, Kaneland, Suburban, Curran Development, Holland, and Holland, Ltd. These companies were engaged in the following businesses:

CCC, Stahl, and Kaneland were primarily engaged in the asphalt paving business. CCC performed most of its work in McHenry County, Illinois, which was the site of its asphalt production plant.[5] CCC received approximately 80 percent of its work from Federal, State and local governments. The

---

[5]Because of high transportation costs, CCC could competitively compete for jobs which were located no more than 30 to 35 miles from its asphalt production plant.

remaining 20 percent of its work was done for larger commercial concerns.

Stahl performed most of its work for Northern Illinois University located in DeKalb County, Illinois. DeKalb County was the site of Stahl's asphalt production plant. During the 1970s, Northern Illinois University was rapidly expanding. As of May 1976, this expansion was projected to continue through 1978.

Kaneland, which was located in Kane County, Illinois, had no access to an asphalt plant. Kaneland was therefore limited to performing "squirt work" in Kane County, which involved spraying oil on dusty gravel roads.

Suburban was engaged in the retail sale of heating oil to homeowners and commercial and industrial concerns located on the west side of Chicago and its western suburbs. During the early 1970s, Suburban's oil business sharply declined as gas replaced oil as the main energy source for residential and commercial heating. John and William therefore decided on or before May 7, 1976, to dispose of Suburban's retail fuel oil business and become fuel brokers. As fuel brokers, John and William intended to purchase oil from the major refineries and to hire independent truckers to deliver the oil to commercial and industrial concerns in retail quantities. As brokers, John and William would never take actual possession of the fuel.

Suburban also owned a parcel of investment property which was located in Oak Brook, Illinois. In 1974, Suburban entered into a contract to sell the property for $740,000. The purchaser subsequently paid an earnest money deposit of $40,000 but eventually defaulted on the contract.

Curran Development was formed in the 1970s to purchase and hold title to a parcel of land located adjacent to property that had been donated to the DeKalb YMCA. Stahl constructed roads on the acquired property to provide access to the donated property and to facilitate the development of the YMCA. As of May 7, 1976, approximately 50 percent of the parcel had been sold. The company had no plans to acquire or develop additional land.

Holland Co. was acquired by Suburban in 1974. The company consisted of the following divisions: (1) The rail weld division which manufactured equipment used for

welding rail on railroads and also provided welding services on a contract basis, and (2) the railroad equipment division which designed, patented, and sold products that extend the useful life of railroad cars and parts used by the railroad industry.

Holland, Ltd., was formed as a subsidiary of Holland for the sole purpose of allowing Holland to engage in business in Canada.

The consolidated balance sheet for CCC and subsidiaries on December 31, 1975, was as follows:

ASSETS

*Current assets*

| | |
|---|---:|
| Cash | $3,009,486 |
| Accounts receivable, etc. | 2,892,800 |
| Inventories | 762,710 |
| Prepaid expenses and other current assets | 156,808 |
| Refundable income taxes | 106,375 |
| Total current assets | 6,928,179 |

*Other assets*

| | |
|---|---:|
| Notes receivable (long term) | 12,384 |
| Cash surrender value of life insurance (net) | 213,112 |
| Real estate investments | 1,018,265 |
| Total other assets | 1,243,761 |
| Deferred income taxes | 14,000 |
| Property, plant and equipment | 3,584,974 |
| Goodwill | 642,248 |
| Total assets | 12,413,162 |

LIABILITIES AND STOCKHOLDERS' EQUITY

*Current liabilities*

| | |
|---|---:|
| Accounts payable | 1,380,195 |
| Accrued liabilities | 893,278 |
| Other current liabilities | 13,563 |
| Current maturities (long-term debt) | 635,820 |
| Total current liabilities | 2,922,856 |
| Long-term debt | 916,757 |
| Other liabilities | 29,000 |

*Stockholders' equity*

| | |
|---|---:|
| Preferred stock ($10 par) | 77,860 |
| Class A voting common ($10 par) | 240 |
| Class B nonvoting common ($1 par) | 9,200 |
| Additional paid-in capital | 1,409,379 |
| Retained earnings | 7,047,870 |
| Total shareholders' equity | 8,544,549 |
| Total liabilities and shareholders' equity | 12,413,162 |

The net sales and net earnings for CCC, Stahl, and Kaneland from 1971 through 1975 were as follows:

| Year | Net sales | Net earnings (before taxes) |
|------|-----------|------------------------------|
| 1971 | $7,501,000 | $1,150,000 |
| 1972 | 4,332,000 | 211,000 |
| 1973 | 5,912,000 | 1,252,000 |
| 1974 | 9,078,000 | 1,601,000 |
| 1975 | 11,363,000 | 2,308,000 |

The net sales and net earnings for Holland and its subsidiary, Holland, Ltd., from 1971 through 1975 were as follows:

| Year | Net sales | Net earnings (before taxes) |
|------|-----------|------------------------------|
| 1971 | $4,418,000 | $499,000 |
| 1972 | 4,341,000 | 544,000 |
| 1973 | 4,096,000 | 923,000 |
| 1974 | 5,745,000 | 897,000 |
| 1975 (11 mos.) | 5,911,000 | 1,125,000 |

On May 7, 1976, John, William, Judy, and Cecilia each simultaneously created a trust (hereinafter referred to as a 76-1 trust) to which they transferred their respective, 6 shares of class A voting common stock of CCC. On the above date, John, William, and Cecilia also each created a second trust (hereinafter referred to as a 76-2 trust) to which they transferred their respective 2,300 shares of class B nonvoting common stock of CCC. All of the trusts were irrevocable after 20 days from the date of creation or the death of the grantor, whichever occurred first. The gifts of the class A voting common stock were made to place initial control of CCC in the hands of John and William, and to place eventual control of the company in the hands of their descendants. The gifts of the class B nonvoting common stock were primarily made to place any future appreciation of CCC in the hands of the grantors' descendants.

These gifts were made as part of petitioners' use of a familiar estate planning device known as an "estate tax freeze," by which the shareholders of a closely held corporation exchange their common stock in the corporation for new shares of common and preferred stock. (See *United States v. Byrum*, 408 U.S. 125 (1972).) The shareholders retain the preferred stock and make gifts of the common

stock. Because the preferred stock does not usually partici-
pate in the future growth of the company, the value of the
preferred shares is "frozen" as of the date of the reorganiza-
tion. The shareholders intend that any future appreciation
in the value of the company will be reflected in the value of
the common stock.[6]

Each 76-1 voting common trust provided for the payment
of net trust income to the descendants of the grantor. Each
76-2 nonvoting common trust provided for discretionary
distribution of trust income and principal to the descen-
dants of the grantor. Both types of trust provided for the
distribution of all trust principal 21 years after the death of
the last to die of: (1) The grantor, (2) the spouse of the
grantor, (3) the grantor of each of the other trusts, (4) the
spouses of the grantors of the other trusts, and (5) all of the
descendants then living of John, William, Cecilia, and Judy.
Each 76-2 trust contained a further provision prohibiting
the trustee from making any transfer of CCC stock other
than to: (1) A trust beneficiary in a partial or complete
distribution upon termination of the trust, or (2) to CCC by
way of a partial or complete redemption.

Each 76-1 trust named John and William as the initial
trustees and gave to each of them the right to designate a
successor trustee who would act when both John and
William ceased to act. After the initial successor trustee
ceased to act, successor trustees were thereafter to be
appointed by the beneficiaries of the four 76-1 trusts.

Each 76-2 trust named the grantor's spouse as the initial
trustee and gave such trustee the right, revocable while
that trustee was still acting, to designate a successor
trustee in the event that for any reason the initial trustee
ceased to act. If and when the initial trustee and the
designated successor trustee ceased to act, the children of
each grantor were to act as co-trustees. Successor trustees
were to be appointed thereafter by the grantor, or after the
death of the grantor, by the beneficiary or a majority in

[6]See G. Cooper, A Voluntary Tax?: New Perspectives on Sophisticated Estate Tax
Avoidance 13-20 (Brookings Institution 1979); Ehrlich, "Corporate Recapitalization as an
Estate Planning Business Retention Tool," 34 N.Y.U. Institute on Federal Taxation 1661,
1662-1669 (1976); and Burch & Hemmerling, "Estate Planning in an Inflationary Economy,"
27 U.S.C. Tax Institute 489, 504-510 (1975).

interest of the beneficiaries to whom current trust income might then be distributed.

Cecilia died on May 11, 1976. On February 4, 1977, CCC redeemed the shares of preferred stock held by the Estate of Cecilia Simon for $630 per share and the shares of class B common stock held by Cecilia's 76-2 trust for 63 cents per share. The redemption price was not the result of arm's-length bargaining, but rather represented an amount which John and William believed would generate sufficient income to pay the living expenses of Cecilia's husband.

On gift tax returns filed for the calendar quarter ending June 30, 1976, petitioners valued CCC's class A voting common stock at $10 per share and class B nonvoting common stock at $1 per share. On amended gift tax returns filed for the calendar quarter ending June 30, 1976, petitioners valued the voting common stock of CCC at $6.30 per share and the class B nonvoting common stock of CCC at 63 cents per share. The values listed on the amended gift tax returns were also assigned to the common stock of CCC on the Federal Estate Tax Return filed for the Estate of Cecilia Simon.[7]

In a notice of deficiency mailed to the Estate of Cecilia C. Simon, respondent valued the class A voting common stock of CCC at $205,000 per share. Respondent further determined that the class B nonvoting common stock of CCC had no value.

In separate notices of deficiency mailed to John Curran, Linda Curran, William Curran, and Patricia Curran, respondent valued CCC's class A voting common stock and class B nonvoting common stock at $534.02 per share.

At trial, the Court received testimony with respect to the valuation of CCC's class A voting common stock and its class B nonvoting common stock from petitioners' expert, Roger J. Grabowski, and respondent's expert, Eugene M. Lerner. Grabowski valued the class A common shares at $470.33 per share and the class B common shares at $58.80 per share. Lerner valued both the class A common shares

---

[7]The value of Cecilia's common stock was includable in her gross estate under sec. 2035(a) as a gift made in contemplation of death.

All section references are to sections of the Internal Revenue Code of 1954 in effect on the valuation date applicable to Mrs. Simon's estate or the date of the respective gifts, as the case may be.

and the class B common shares at $454.99 per share. By amended answer filed subsequent to the trial of this case, respondent stated that the May 7, 1976, value of the class A and class B common stock held by the Estate of Cecilia C. Simon was $454.99 per share.

The valuations placed on the two classes of common stock by the experts are reflected in the following table:

| Appraiser | Class A common | | | Class B common | | |
|---|---|---|---|---|---|---|
| | Shares | Value | Total | Shares | Value | Total |
| Grabowski | 24 | $470.33 | $11,287.92 | 9,200 | $58.80 | $540,960 |
| Lerner | 24 | 454.99 | 10,919.76 | 9,200 | 454.99 | 4,185,908 |

Thus, petitioners' expert valued the entire common stock at $552,247.92, while respondent's expert valued it at $4,196,827.70, the basic difference resulting from petitioners' deep discount of the class B common. The appropriateness of this discount is the essential focal point of this case.

### Grabowski Appraisal

Roger J. Grabowski is a partner and co-founder of Valuation Strategies, a firm specializing in the valuation of closely held businesses and intangible assets. Petitioners retained Grabowski to value CCC's class A voting common stock and class B nonvoting common stock. Grabowski used two methods to value these stocks: (1) The market comparable approach, and (2) the discounted cash flow approach.

### Market Comparable Approach

Using the market comparable approach, Grabowski set out to estimate the value of CCC by comparing it to publicly traded companies engaged in the same or similar lines of businesses as that of CCC and its subsidiaries. Because he was unable to find publicly traded companies which were engaged in the asphalt paving business, the rail welding business, and the heating oil distribution business, Grabowski divided CCC into its operational components and looked for publicly traded companies engaged in the same business as each component. He grouped CCC, Stahl, and Kaneland together and treated them as one company engaged in the asphalt paving business (we will hereinafter

refer to CCC, Stahl, and Kaneland as C/S/K for purposes of our discussion of Grabowski's valuation). He treated Holland (including its subsidiary, Holland, Ltd.) as a separate company engaged in the railroad equipment business. Finally, he separately valued Suburban and the other nonoperating assets owned by CCC and its subsidiaries.

## Valuation of C/S/K

Grabowski discovered three publicly traded companies that he believed were engaged in businesses that were subject to the same economic conditions as the road construction business of C/S/K. These companies were: (1) McDowell Enterprises, Inc., (2) Rexco Industries, and (3) Sukut Construction, Inc.

McDowell Enterprises, Inc., located in Nashville, Tennessee, was engaged in diversified construction, including highway construction and real estate development. The company was also engaged in the development of material supply throughout the southeastern United States. In 1975, its revenues totaled $55 million.

Rexco Industries, located in Puerto Rico, was primarily engaged in the construction of highways, bridges, hospitals, commercial buildings, industrial plants, and residential buildings. Its revenues totaled $56 million in 1975.

Sukut was a general contracting firm engaged in the construction of sites for residential, commercial, industrial, and recreational developments and in the construction of roads, highways, and public works. Sukut performed most of its work in southern California. In 1975, its revenues totaled approximately $8 million.

Having identified three publicly traded comparable companies, Grabowski next computed certain market multiples based on the comparable companies' earnings before deductions for interest, depreciation, and taxes (EBIDT) and debt-free cash-flow (DFCF).[8] Dividing the sum of the aggregate market value of the capital stock and long-term debt of each comparable company by its respective EBIDT and

---

[8]Grabowski defined debt-free cash-flow as the cash-flow generated by the operations of the company (net earnings plus non-cash expenses such as depreciation) adjusted to a debt free basis by adding back the after tax cost of interest.

DFCF, Grabowski developed the following market multiples for the comparable firms:

| Firm | Market value | EBIDT | EBIDT multiple | DFCF | DFCF multiple |
|------|-------------|-------|----------------|------|---------------|
| McDowell | $19,106,000 | $6,121,000 | 3.12 | $4,381,000 | 4.36 |
| Rexco | 18,894,000 | 4,631,000 | 4.08 | 4,073,000 | 4.64 |
| Sukut | 1,166,000 | 578,000 | 2.02 | 455,000 | 2.56 |

Grabowski next computed C/S/K's EBIDT and DFCF. Relying on C/S/K's weighted earnings for the 5-year period preceding the valuation date, Grabowski determined that C/S/K had EBIDT of $1,929,000 and DFCF of $1,174,000. Applying the above market multiples to C/S/K's EBIDT and DFCF, Grabowski preliminarily valued C/S/K at $5 million.

Grabowski next adjusted the market multiples to account for the differences in size between C/S/K and the comparable firms. To make these adjustments, Grabowski relied on an Internal Revenue Service study which listed average price/earnings ratios for companies traded on the New York Stock Exchange according to their fair market value. Based on this study, Grabowski concluded that publicly traded companies with values equal to C/S/K had average price/earnings ratios of 10.10. He further determined that publicly traded companies with values equal to McDowell and Rexco had average price/earnings ratios of 11.35. He finally concluded that companies with values equal to Sukut had average price/earnings ratios of 12.26. Based on these relative price/earnings ratios, Grabowski determined the following percentages to account for the market's reaction to the differences in size between C/S/K and the comparable firms:

| Comparable | Factor |
|------------|--------|
| McDowell and Rexco | 10.10/11.35 = .89 |
| Sukut | 10.10/12.26 = .824 |

Grabowski next weighted each market multiple based on the relative similarity of each comparable company to C/S/K. Finally, applying the market multiples as adjusted to C/S/K's EBIDT and DFCF, Grabowski valued C/S/K at $5,884,000 and $4,479,000, respectively, as follows:

| | EBIDT MULTIPLE | | | | DFCF MULTIPLE | | | |
| Firm | Multiple | Adjustment for Size | Weight | Adjustment multiple | Multiple | Adjustment for Size | Weight | Adjustment multiple |
|---|---|---|---|---|---|---|---|---|
| McDowell | 3.12 x | .89 x | .45 = | 1.2496 | 4.36 x | .89 x | .45 = | 1.7462 |
| Rexco | 4.08 x | .89 x | .45 = | 1.6340 | 4.64 x | .89 x | .45 = | 1.8583 |
| Sukut | 2.02 x | .824 x | .10 = | .1665 | 2.56 x | .824 x | .10 = | .2109 |
| | | | | 3.0501 | | | | 3.8154 |
| | | | | x $1,929,000 (EBIDT) | | | | x $1,174,000 (DFCF) |
| Indicated value | = | | | $5,884,000 (rounded) | = | | | $4,479,000 (rounded) |

Taking an average of these two values, Grabowski valued C/S/K at $5,181,000 as of May 7, 1976.[9]

## Holland Co.

Grabowski selected six publicly traded companies which he believed were subject to the cyclical nature of the railroad industry and thus comparable to Holland (including its subsidiary, Holland, Ltd.). These companies were: (1) Amsted Industries, (2) Brenco, (3) Portec, (4) General Signal, (5) Pittsburgh Forgings, and (6) Stanray.

Amsted Industries was engaged in numerous businesses, including the manufacture of component parts for railroad cars.[10] These components consisted of side frames and bolsters (commonly known as trucks), couplers, springs, yokes, brake beams, springs, steel railroad wheels, brake shoes for railroad cars and locomotives, and brass journal bearings. Its revenues totaled $489 million in 1975.

Brenco manufactured and serviced roller bearings and bronze bearings for railroad cars and other industrial markets. Its revenues totaled $43 million in 1975.

Portec designed, manufactured, and sold products for transportation and industrial markets, including rail anchors and lubricators and rail car auto shipping racks. It had sales of $107 million in 1975.

General Signal produced cabs, wayside, and centralized traffic control components and systems, pushbutton interlocking controls, operational display subsystems, and other control systems for railroads. It also engaged in numerous other businesses.[11] The company's sales totaled $547 million in 1975.

---

[9]We note that the average of $5,884,000 and $4,479,000 is $5,181,500 rather than $5,181,000.

[10]The record does not disclose the other businesses engaged in by Amsted Industries.

[11]The record does not disclose the other businesses engaged in by General Signal.

Pittsburgh Forgings Co. was engaged in (1) the construction and repair of railroad freight cars, and (2) the castings business. Its sales totaled $179 million in 1975.

Stanray Corp. manufactured metal roofs, coupling devices, wheel truing machines, and other items and equipment for use in the construction, repair, and rebuilding of railroad cars. The company was also engaged in various other businesses.[12] Its sales totaled $75 million in 1975.

Following the same approach as described above, Grabowski developed market multiples based upon the EBIDT and debt-free cash-flow of the comparable firms. Applying these market multiples to Holland's EBIDT and DFCF, Grabowski valued Holland at $4,024,000 and $4,777,000, respectively. Grabowski's calculations may be summarized as follows:

| Firm | EBIDT MULTIPLE — Multiple for Size Weight | Adjustment multiple | DFCF MULTIPLE — Multiple for Size Weight | Adjustment multiple |
|---|---|---|---|---|
| Amsted | 3.44 x .635 x .15 = | .3277 | 5.77 x .635 x .15 = | .5496 |
| Brenco | 5.98 x .735 x .20 = | .8791 | 10.18 x .735 x .20 = | 1.4965 |
| Portec | 4.63 x .859 x .20 = | .7954 | 7.63 x .859 x .20 = | 1.31083 |
| General Signal | 4.50 x .635 x .15 = | .4286 | 11.68 x .635 x .15 = | 1.1125 |
| Pittsburgh Forging | 4.50 x .735 x .20 = | .6615 | 7.31 x .735 x .20 = | 1.0746 |
| Stanray | 2.81 x .890 x .10 = | .2501 | 4.80 x .890 x .10 = | .4272 |
| | | 3.3424 | | 5.97123 |
| | | x $1,204,000 (EBIDT) | | x $800,000 (DFCF) |
| | Indicated Value x | $4,024,000 (rounded) = | | $4,777,000 (rounded) |

Grabowski averaged these values to arrive at an indicated rounded value of $4,400,000 for Holland.

### Remaining Subsidiaries

As of the date of the gifts in issue, the board of directors of CCC had decided to dispose of Suburban's retail fuel oil business and have Suburban become a fuel broker. Grabowski therefore determined that Suburban's liquidation value was the most accurate estimate of Suburban's value as of the date of the gifts. Grabowski estimated the liquidation value of Suburban (net of estimated corporate taxes due on sale and estimated costs of sale including holding costs) as follows:

---

[12]The record does not disclose the other businesses engaged in by Stanray Corp.

| | |
|---|---:|
| Excess of current assets over current liabilities | $1,100,000 |
| Equipment | 20,000 |
| Land and buildings in Forest Park | 325,000 |
| (3 buildings and 1 vacant parcel) | |
| Retail home heating oil customer list | 25,000 |
| Land in Oak Brook, Illinois | 780,000 |
| Total | 2,250,000 |

Grabowski estimated the liquidation value of certain other nonoperating assets owned by CCC as follows:

| | |
|---|---:|
| Farmland in Crystal Lake | $175,000 |
| Land owned by Curran Development | 240,000 |
| Total | 415,000 |

To the above liquidation values, Grabowski added an amount representing the value of CCC's net working capital.[13] Grabowski valued CCC's net working capital as of May 7, 1976, at $400,000.

Because the gifts in issue represented minority interests in CCC, Grabowski reduced the value of CCC's net working capital and the asset liquidation value of its nonoperating assets by a minority position discount of 35 percent.[14] Grabowski based this discount factor on a study conducted by Douglas Austin which found that in successful cash tender offers occurring during the period 1972 through 1975, investors paid an average premium of 35.75 percent for stock which represented a controlling interest in a company. Based on a minority discount factor of 35 percent, Grabowski determined a minority position equivalent value of $2,270,000 (($400,000 plus $2,665,000) divided by 1.35) for Suburban and the other nonoperating assets of CCC.

Grabowski combined the above values he determined for C/S/K, Holland, Suburban, and the other nonoperating assets owned by CCC and its subsidiaries to arrive at a total value of $11,851,000 for CCC's long-term capital debt, preferred stock, and total common equity. To determine the value of CCC's total common equity, Grabowski reduced the above

---

[13]Grabowski defined net working capital as the amount of cash which could be removed from the businesses without impairing their operations.

[14]Grabowski did not apply a minority position discount to the values determined for C/S/K and Holland because the market prices of the common stock of the comparable firms used to compute the market multiples represent minority positions in those companies.

value by $1,339,000, the amount of CCC's outstanding long-term debt as of May 7, 1976, and by $4,983,040, the intrinsic value of CCC's preferred stock as of the valuation date.

To value the outstanding shares of CCC's preferred stock, Grabowski looked to the average dividend yield for the following publicly traded preferred stocks as listed in Moody's Preferred Stock Yield Averages for May 1976:

| Stock | Yield |
| --- | --- |
| High grade industrials | 7.59 percent |
| Medium grade industrials | 7.86 percent |
| Speculative grade industrials | 8.48 percent |

Based on these yields, Grabowski concluded that a reasonable yield for the preferred stock of CCC would be 12.5 percent, pointing out that while CCC's preferred dividends were noncumulative, the company had sufficient resources to pay preferred dividends without impairing ongoing business operations. Based on a dividend yield of 12.5 percent, Grabowski valued the 7,786 outstanding shares of CCC preferred stock at $4,983,040, or $640 per share.[15]

Subtracting $1,339,000, the amount of CCC's outstanding long-term debt, and $4,983,040, the value of CCC's issued and outstanding shares of preferred stock, from $11,851,000, the total value of CCC and its subsidiaries, Grabowski determined a value of $5,528,960 for CCC's total common equity.[16]

### Discounted Cash-Flow Approach

Grabowski used a second method to value the common stock of CCC. Under this second approach, Grabowski valued Suburban and CCC's other nonoperating assets using their previously determined liquidation values. Grabowski, however, used the discounted cash-flow approach to value

---

[15]We note that in his valuation report, Grabowski stated that "To determine the Fair Market Value of the preferred stock one needs to reduce this amount by a discount for lack of marketability." In determining the market value of CCC's preferred stock, however, Grabowski did not discount its intrinsic value for lack of marketability. On brief, petitioners maintain that a discount of 20 percent for lack of marketability would have been appropriate. Based on a 20-percent discount, the value of CCC's preferred stock would be $3,986,432, or $512 per share.

[16]We note that had Grabowski valued CCC's preferred stock at $3,986,432, rather than $4,983,040, the value of CCC's total common equity would have been $6,525,568, rather than $5,528,960.

C/S/K and Holland. This valuation method is based on the assumption that the price an investor will pay for a share of stock is the present value of the future stream of income he expects to receive from the investment.

Under the discounted cash-flow approach, Grabowski determined a present value equivalent for: (1) The amount of cash that C/S/K and Holland could pay to their shareholders over a 10-year period without impairing business operations (we will hereinafter refer to this amount as available cash-flow),[17] and (2) the companies' residual value at the end of 10 years. Adding these two values together, Grabowski determined a second value for the common shareholders' equity in C/S/K and Holland.

In computing C/S/K's projected 10-year cash-flow, Grabowski estimated that C/S/K's 1976 revenues would be 15 percent less than its 1975 revenues. He based this projection on C/S/K's sales experience for the first 4 months of 1976. Relying on C/S/K's average revenue trend for the period 1970 through 1975, Grabowski projected that C/S/K's net sales would increase 5 percent in each of the years 1977 through 1980 and 2 percent in each of the years 1981 through 1985. Grabowski estimated C/S/K's expenses for the 10-year period as a percentage of projected sales. These percentages were based on average trends experienced by C/S/K in prior years.

Grabowski projected that Holland's 1976 revenues would be 30 percent greater than its 1975 revenues. He based this projection on Holland's sales experience for the first 4 months of 1976. Grabowski attributed this increase in sales to favorable provisions contained in the Railroad Revitalization and Regulatory Reform Act of 1976 which encouraged railroads to upgrade their track. Grabowski believed that these provisions would continue to benefit Holland's business in the future and therefore projected that Holland's net sales would increase 20 percent in 1977, 15 percent in 1978 and 1979, 10 percent each year from 1980 through 1982,

---

[17]Grabowski defined available cash-flow as: (1) Net income after taxes *plus* (2) depreciation/amortization *minus* (3) increases in net working capital needed to support sales *minus* (4) capital expenditures *minus* (5) repayments of principal on long-term debts *minus* (6) preferred stock dividends. In his actual computations of available cash-flow, Grabowski also made an addition and a reduction in net working capital for certain years. See table summarizing Grabowski's computation *infra*.

and 8 percent per year from 1983 through 1985. As with C/S/K, Grabowski estimated Holland's expenses for the 10-year period as a percentage of its projected sales. These percentages were based on average trends experienced by Holland in prior years. The table on page 367 summarizes Grabowski's computation of C/S/K's and Holland's available cash-flow:

To determine a present value equivalent for these 10-year projected cash-flows, Grabowski was required to determine an appropriate discount rate. He used the following formula to arrive at the appropriate discount rate:

$$K = R_f + Beta\ (R_1) + R_2$$

$K$ = cost of equity capital

$R_f$ = current market rate on U.S. Government bonds

$R_1$ = premium an investor would expect before he would invest in common stock rather than U.S. Government bonds

Beta = relationship between the movement of stock prices for companies engaged in specific industries (i.e., construction business, and railroad supply business) and the movement of stock prices in general

$R_2$ = additional premium an investor would expect before he would invest in the common stock of C/S/K and Holland

Grabowski determined that in May 1976, the current market yield on 10-year U.S. Government bonds was 6.96 percent. To this figure he added a risk premium which represented the additional return an investor would require before he would invest in common stocks of publicly traded companies engaged in the construction business and railroad supply business rather than U.S. Government securities. To determine this premium, Grabowski first determined that an investor would require an additional return of 6 to 8 percent before he would invest in common stocks in general, rather than U.S. Government securities. Grabowski based this figure on studies which found that investors in diversified portfolios of common stocks trading on the New York Stock Exchange realized yields which were 6 percent to 8 percent larger than yields on long-term U.S. Government securities. Grabowski then multiplied this risk pre-

($000)

| | 1976 (8 mos.) | 1977 | 1978 | 1979 | 1980 | 1981 | 1982 | 1983 | 1984 | 1985 |
|---|---|---|---|---|---|---|---|---|---|---|
| Operating income | | | | | | | | | | |
| CCC/Stahl/Kaneland | $2,457 | $1,875 | $1,800 | $1,900 | $1,870 | $1,670 | $1,700 | $1,740 | $1,770 | $1,810 |
| Holland | 1,557 | 1,850 | 2,130 | 2,720 | 2,990 | 3,290 | 3,620 | 3,910 | 4,220 | 4,560 |
| Total | 4,014 | 3,725 | 3,930 | 4,620 | 4,860 | 4,960 | 5,320 | 5,650 | 5,990 | 6,370 |
| Less: Interest expense | 33 | 90 | 70 | - - - | - - - | - - - | - - - | - - - | - - - | - - - |
| Equals: Pre-tax income | 3,981 | 3,635 | 3,860 | 4,620 | 4,860 | 4,960 | 5,320 | 5,650 | 5,990 | 6,370 |
| Less: Income taxes | 1,913 | 1,685 | 1,780 | 2,150 | 2,250 | 2,290 | 2,450 | 2,600 | 2,760 | 2,930 |
| Plus: Depreciation | | | | | | | | | | |
| CCC/Stahl/Kaneland | 272 | 405 | 425 | 445 | 470 | 475 | 485 | 495 | 505 | 515 |
| Holland | 315 | 500 | 570 | 660 | 730 | 800 | 880 | 955 | 1,030 | 1,110 |
| Less: Increases in net working capital | | | | | | | | | | |
| CCC/Stahl/Kaneland | (250) | 70 | 80 | 85 | 35 | 35 | 35 | 35 | 35 | 40 |
| Holland | 200 | 170 | 150 | 180 | 130 | 150 | 160 | 150 | 160 | 165 |
| Less: Capital expense | | | | | | | | | | |
| CCC/Stahl/Kaneland | 430 | 460 | 480 | 500 | 530 | 540 | 550 | 560 | 570 | 580 |
| Holland | 690 | 1,000 | 1,160 | 1,330 | 1,460 | 1,610 | 1,770 | 1,910 | 2,060 | 2,230 |
| Less: Principal payments on debt | 430 | 635 | 275 | - - - | - - - | - - - | - - - | - - - | - - - | - - - |
| Equals: Cash-flow before preferred dividends | 1,155 | 520 | 930 | 1,480 | 1,655 | 1,610 | 1,720 | 1,845 | 1,940 | 2,050 |
| Less: Preferred dividends | 622 | 622 | 622 | 622 | 622 | 622 | 622 | 622 | 622 | 622 |
| Plus: Reductions in net working capital | - - - | (102) | | 500 | - - - | - - - | - - - | - - - | - - - | - - - |
| Equals: Available cash-flow | 533 | 0 | 308 | 1,358 | 1,033 | 988 | 1,098 | 1,223 | 1,318 | 1,428 |

mium by a "beta coefficient" which represented the relationship between the movement of stock prices for publicly traded companies engaged in the construction business and the railroad supply business and the movement of stock prices in general. Based on a sample of common stock of publicly traded companies engaged in construction, Grabowski estimated that such stocks had a beta of 1.3 (i.e., when stock prices in general increase or decrease 10 percent, the stock prices for publicly traded companies engaged in construction increase or decrease 30 percent). Based on a sample of common stocks of publicly traded companies engaged in the railroad supply business, Grabowski determined that such stocks had a beta of .95 (i.e., when stock prices in general increase or decrease by 10 percent, the stock prices for publicly traded companies engaged in the railroad supply business increase or decrease 9.5 percent).

Finally, Grabowski added a risk premium to reflect the additional return an investor would require before he would choose to invest in the common stock of an unlisted company similar to C/S/K and Holland. He determined that a risk premium of 3 percent to 6 percent would be appropriate for Holland and a risk premium of 4 percent to 7 percent would be appropriate for C/S/K.

Applying the formula $K = R_f + \text{Beta}(R_1) + R_2$ to the above variables, Grabowski determined that an investor would require an expected average return of 21 percent on an investment in the common stock of C/S/K and Holland before he would decide to make such an investment. Grabowski applied the formula as follows:

C/S/K: K = 6.96% + 1.3 (6%-8%) + (4%-7%)
Holland: K = 6.96% + .95 (6%-8%) + (3%-6%)

Based on a discount factor of 21 percent, Grabowski determined a present value equivalent of $3,159,000 for the 10-year projected cash-flows as follows:

($000)

|  | 1976 (8 mos.) | 1977 | 1978 | 1979 | 1980 |
|---|---|---|---|---|---|
| Cash-flow | 533 | 0 | 308 | 1,358 | 1,033 |
| PV Factor at 21% | .8807 | .7278 | .6015 | .4971 | .4108 |
| Present value | 469 | 0 | 185 | 675 | 424 |

($000)

| | 1981 | 1982 | 1983 | 1984 | 1985 | Total |
|---|---|---|---|---|---|---|
| Cash-flow | 988 | 1,098 | 1,223 | 1,318 | 1,428 | |
| PV Factor at 21% | .3395 | .2806 | .2319 | .1917 | .1584 | |
| Present value | 335 | 308 | 284 | 253 | 226 | 3,159 |

Having determined the present value of the 10-year projected cash-flows for C/S/K and Holland, Grabowski next determined the present value of the companies' residual values at the end of 10 years. Estimating that future available cash-flows would grow approximately 4 percent per year after 1985 and applying a 21-percent discount factor, Grabowski determined a present value of $1,331,000 for the residual value of C/S/K and Holland at the end of 10 years.

To determine the total value of the common shareholders' equity, Grabowski added together the values he determined for C/S/K and Holland using the discounted cash-flow approach and the previously determined liquidation values of Suburban and the other nonoperating assets owned by CCC. Based on the sum of these values, Grabowski valued CCC's common shareholders' equity at $7,155,000.

Grabowski next discounted the above value by 35 percent to reflect the fact that the gifts in issue represented minority positions in CCC. Applying this minority discount factor to the above value, Grabowski determined a final value of $5,300,000 for CCC and its subsidiaries under the discounted cash-flow approach.

Grabowski averaged CCC's market comparable value (rounded to $5,529,000) and discounted cash-flow value ($5,300,000) to arrive at a final value of $5,425,000 for CCC's total common equity.[18]

*Allocation of Common Shareholders' Equity Among Class A Voting Shares and Class B Nonvoting Shares*

Having determined a total value of $5,425,000 for CCC's common shareholders' equity, Grabowski next determined that this amount should be allocated pro rata among CCC's outstanding shares of common stock, concluding that each

---

[18]We note that had Grabowski valued CCC's common equity at $6,525,568 using the market comparable approach, the average value for CCC's common equity would be $5,912,784.

share of class B nonvoting common was equal in value to each share of class A voting common. Grabowski based this conclusion on the fact that the holder of a minority interest in CCC's class A voting common stock would not possess voting control and therefore could not affect the company's dividend policies. Grabowski therefore believed that the class A shareholders would receive the same dividends per share as the class B shareholders in the event CCC paid common dividends. Grabowski thus valued the 24 shares of the class A voting common stock at $14,105 ($588 per share), which represented .26 percent of CCC's total common equity. Similarly, he valued the 9,200 shares of class B nonvoting common at $5,410,895 ($588 per share), which represented 99.74 percent of CCC's total common equity.[19]

## Discount for Lack of Marketability

Grabowski next discounted the indicated stock values for lack of marketability. With respect to the class A common shares, Grabowski applied a discount of 20 percent for lack of marketability. In determining the appropriate discount rate, Grabowski noted that an investor could purchase 6 shares of CCC's class A common stock for a relatively small sum of money ($3,528). He also pointed out that an investor would be aware of CCC's ability to pay dividends to its common shareholders. On the other hand, Grabowski emphasized that an investor would know that the management of CCC did not intend to pay dividends and that the remaining 18 shares of class A common stock were held in trusts which placed control of the company in CCC's present management and their appointed successors for many years in the future.

Grabowski reduced the value of CCC's class B common stock by a 90-percent discount for lack of marketability. Grabowski based this large discount on the fact that an investor would be required to pay $1,352,400 to acquire a block of 2,300 shares of class B common stock at a price of $588 per share. Grabowski concluded that an investor would not pay more than $135,240 for such shares given the small

[19]The aggregate values of the class A and class B common stock were rounded by Grabowski. We also note that had Grabowski valued CCC's common equity at $5,912,784, the value of each share of CCC common stock would have been $641.

probability that the management of CCC would decide to pay common dividends, to redeem the stock, or to liquidate the corporation.

Consequently, based on the analysis described above, Grabowski valued each block of 6 shares of CCC class A voting common stock at $2,822, or $470.33 per share, and each block of 2,300 shares of CCC class B nonvoting common stock at $135,240, or $58.80 per share.

### Lerner Appraisal

Eugene M. Lerner is a Professor of Finance in the Graduate School of Management at Northwestern University. He was retained by respondent to value the class A and class B common stock of CCC at issue in this case.

### Market Comparable Approach

Lerner first valued CCC using a market comparable approach. He initially searched for publicly traded companies engaged in the asphalt paving business, the rail welding business, and the heating oil distribution business. However, because he was unable to locate individual companies engaged in all three businesses, Lerner looked for publicly traded companies with similar financial characteristics as CCC.

Lerner determined that during the period 1971 through 1975, CCC had a return on equity of 15.56 percent, sales of approximately $20 million per year, and a debt/equity ratio of 45 percent. Using Compustat, a computer program containing the financial data of approximately 2,500 publicly traded companies, Lerner searched for companies with returns on equity ranging from 12 percent to 17 percent, sales of less than $25 million, and debt/equity ratios of less than 70 percent. Lerner discovered 17 publicly traded companies meeting all three financial criteria.

Lerner next computed the price/earnings ratio, the price/book value ratio, and the dividend/price ratio for each comparable company. The averages for these ratios are set forth below:

| Ratio | Average |
| --- | --- |
| Price/earnings | 7.9 |
| Price/book value | 1.075 |
| Dividend/price | 3.6% |

Based on these ratios, Lerner valued CCC as follows:

| Year | Income | Weight | Weighted income |
|------|--------|--------|-----------------|
| 1971 | $838,054 | 1 | $838,054 |
| 1972 | 306,749 | 2 | 613,498 |
| 1973 | 1,176,537 | 3 | 3,529,611 |
| 1974 | 1,414,801 | 4 | 5,659,204 |
| 1975 | 1,861,085 | 5 | 9,305,425 |
| | 5,597,085 | 15 | 19,945,792 |
| Weighted income | | | $1,329,719 |

Based on weighted income of $1,329,719 and a price/earnings ratio of 7.9, Lerner valued CCC at $10,504,780.

Lerner next computed a book value of $8,544,549 for CCC. Based on a comparable price/book ratio of 1.075, Lerner valued CCC at $9,185,390.

As a result of its strong financial condition, Lerner estimated that CCC could have paid annual dividends of $438,807 (33 percent of weighted earnings of $1,329,719). Based on a dividend/price ratio of 3.6 percent, Lerner valued CCC at $12,190,058.

Using a weighted average of the above values, Lerner determined a final value of $10,211,521 for CCC and its subsidiaries as follows:

| Ratio | Valuation | Weight[20] | Weighted valuation |
|-------|-----------|--------|--------------------|
| Price/earnings | $10,504,780 | 55 | $5,777,629 |
| Price/book value | 9,185,390 | 35 | 3,214,886 |
| Dividend/price | 12,190,058 | 10 | 1,219,000 |
| | | | 10,211,515 |

### Second Valuation Method

In addition to valuing CCC as one consolidated company, Lerner also separately valued CCC's operational components (i.e., the paving companies, Suburban, and Holland). He used the market comparable approach described above to value the three paving companies. He relied on Suburban's

---

[20]In determining the appropriate weight to assign to each value, Lerner concluded that investors, aware that CCC's management had historically paid low dividends, would have placed less emphasis on CCC's dividend/price ratio and more emphasis on its price/earnings ratio and price/book value ratio.

book value as a fair indication of that company's market value. Finally, Lerner valued Holland based on the sum of its 1974 purchase price and the company's post-acquisition earnings. Lerner's computations may be summarized as follows:

Paving Companies

| Ratio | Factors | Amount | Valuation | Weight | Weighted valuation |
|---|---|---|---|---|---|
| Price/earnings | 7.69 | $813,997 | $6,259,637 | 55 | $3,442,800 |
| Price/book value | .971 | 6,668,805 | 6,475,410 | 35 | 2,266,394 |
| Dividend/price | 4% | 268,619 | 6,715,475 | 10 | 671,548 |
| | | | | | 6,380,742 |
| Suburban book value | | | | | 1,625,095 |
| Holland | | | | | |
| 1974 purchase price | | $2,887,300 | | | |
| Post-acquisition earnings | | 703,449 | | | 3,590,749 |
| Total value | | 3,590,749 | | | 11,596,586 |

*Valuation of CCC's Common Equity*

Having valued CCC at $10,211,515 using the market comparable approach and having valued CCC at $11,596,586 using a combination of several different valuation methods, Lerner averaged these two values to arrive at a final value of $10,904,054 for CCC and its subsidiaries. To determine the value of CCC's common equity, Lerner subtracted $4,447,363, the value of CCC's preferred stock, from the company's overall value of $10,904,054.

To value the preferred stock of CCC, Lerner looked to the return an investor could realize on the following alternative investments:

| Investment | Rate of return |
|---|---|
| U.S. Treasury securities | |
| 3 years | 7.49% |
| 10 years | 7.99 |
| Corporate bonds | |
| AAA | 8.83 |
| BAA | 10.61 |
| Medium grade industrials | 8.58 |

Based on the yield of these alternative investments and recognizing that an investor would perceive some additional risk in investing in the preferred stock of CCC, Lerner conservatively concluded that a potential investor would

expect a return of at least 14 percent on the amount of cash he would be required to invest to purchase CCC's preferred stock. Based on a 14-percent dividend yield and assuming that CCC's preferred stock would pay its stated dividend of $80 per share, Lerner valued the preferred stock of CCC at $4,447,363 or $571.20 per share. Subtracting this amount from his aggregate valuation of CCC, Lerner valued CCC's common equity at $6,456,691.

Lerner next allocated the value of CCC's common equity pro rata among the class A voting common stock and the class B nonvoting common stock. As did petitioners' expert, Lerner determined that each share of class A common stock was equal in value to each share of class B common stock. He therefore valued the 24 issued and outstanding shares of class A voting stock and the 9,200 issued and outstanding shares of class B nonvoting stock at $699.99 per share.

*Minority Discount and Discount for Lack of Marketability*

Finally, Lerner reduced the value of each share of common stock by a minority discount of 15 percent and a discount of 20 percent for lack of marketability. In determining the appropriate discounts, Lerner considered the fact that the stock of small, closely held corporations is generally difficult to sell. He believed, however, that this negative factor would be substantially offset by a potential buyer's awareness that CCC was a financially strong old-line company with excellent and aggressive management and the capacity to pay dividends. After applying a minority discount and a discount for lack of marketability, Lerner determined a final fair market value of $454.99 for each share of CCC common stock.

## OPINION

At issue in this case is the value for gift tax purposes of CCC's class A and class B common stock held by John Curran and William Curran on May 27, 1976,[21] the date of

---

[21] On brief, both petitioners and respondent treat the appropriate valuation date as May 7, 1976, the date on which the trusts in issue were created. These trusts, however, were revocable until the earlier of May 27, 1976, or the death of the grantor. Consequently, the gifts were not complete for Federal gift tax purposes until May 27, 1976, when the trusts became irrevocable. Sec. 25.2511-2(c), Gift Tax Regs.

the gifts in issue and the value for estate tax purposes of CCC's class A and class B common stock held by Cecilia Simon on May 11, 1976, the date of her death.

Under section 2035(a), the value of the gross estate includes (with certain exceptions not here applicable) the value of all property transferred by the decedent within 3 years of death. Since the executor of Mrs. Simon's estate did not elect alternative valuation under section 2032, the date of death (May 11, 1976) value applies as to the stock in her estate. Under section 2512(a), the value of property for gift tax purposes is determined on the date of the gift.

For both estate and gift tax purposes, fair market value is defined as "the price at which such property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell, and both having reasonable knowledge of relevant facts." Sec. 20.2031-1(b), Estate Tax Regs.; sec. 25.2512-1, Gift Tax Regs. The valuation of stock presents a question of fact, and the trier of fact has the duty to weigh all relevant evidence and to draw appropriate inferences therefrom. *Hamm v. Commissioner*, 325 F.2d 934, 938 (8th Cir. 1963), affg. T.C. Memo. 1961-347.

Section 20.2031-2(f), Estate Tax Regs., and section 25.2512-2(f), Gift Tax Regs., set forth some of the relevant factors to be considered in determining the value of stock in a closely held corporation in the absence of actual sales prices and bona fide bid and asked prices. Those factors include the company's net worth, prospective earning power, dividend-paying capacity, and other relevant factors. The regulation states that "other relevant factors" include:

the good will of the business; the economic outlook in the particular industry; the company's position in the industry and its management; the degree of control of the business represented by the block of stock to be valued; and the values of securities of corporations engaged in the same or similar lines of business which are listed on a stock exchange. However, the weight to be accorded such comparisons or any other evidentiary factors considered in the determination of a value depends upon the facts of each case. * * *

At trial, petitioners and respondent each presented the testimony of an expert to establish the value of CCC's common stock. Petitioners' expert valued CCC's class A

voting common stock at $470.33 per share, and CCC's class B nonvoting common stock at $58.80 per share. Respondent's expert valued both the class A and class B stock at $454.99 per share. We recognize that expert testimony is peculiarly appropriate in cases dealing with the value of stock of unlisted, closely held corporations. *Central Trust Co. v. United States*, 158 Ct. Cl. 504 (1962), 305 F.2d 393. Nevertheless, for the reasons stated below, we do not fully agree with either expert's valuation determination.

To summarize briefly, petitioners' expert, Grabowski, relied on the market comparable approach and the discounted cash-flow approach to value CCC, Stahl, Kaneland, and Holland. He relied on the liquidation values of the remaining subsidiaries as evidence of their intrinsic values. Respondent's expert, Lerner, used a modified market comparable approach to value CCC and its subsidiaries as one consolidated company as well as to individually value CCC, Stahl, and Kaneland. After valuing CCC, Stahl, and Kaneland by using a modified market comparable approach, Lerner valued Suburban based on its book value and Holland based on its 1974 purchase price increased by its post-acquisition earnings.

First, we cannot accept Grabowski's market comparable valuation of CCC, Stahl, Kaneland, and Holland. Section 2031(b) provides that "the value of stock or securities of corporations engaged in the same or a similar line of business which are listed on an exchange" is a factor to be considered in valuing the stock of an unlisted corporation. In valuing CCC, Stahl, and Kaneland, Grabowski relied on market multiples based on the financial statistics of McDowell, Rexco, and Sukut, publicly traded companies engaged in the construction of highways, residential buildings, commercial buildings, and industrial plants. CCC, Stahl, and Kaneland, however, were Illinois companies engaged solely in the asphalt paving business. If the "other relevant factors" concept of section 20.2031-2(f) is to be meaningfully applied, then companies engaged in diversified construction are not sufficiently similar to companies engaged solely in asphalt paving to provide reliable comparisons for valuation purposes. This is particularly true in the instant case since the record contains no evidence of the

percentage of revenues earned by the comparable companies from highway construction. Such revenues may be insignificant in relation to the total revenues of the companies compared.

We also point out that Grabowski's expert report shows that sales for CCC, Stahl, and Kaneland increased 21 percent per year during the period 1971 through 1975, while sales for the comparable companies increased only 5 to 11 percent during this same period. Moreover, the capital structures of the comparable companies differed significantly from the capital structures of CCC, Stahl, and Kaneland.

We are similarly unpersuaded by the comparable companies which Grabowski relied upon to value Holland. At the time of the transfers, a substantial portion of Holland's business consisted of the manufacture, assembly, and sale of rail welding equipment. Holland also provided welding services on a contract basis. The comparable companies which Grabowski relied upon were publicly traded companies engaged in the sale of various types of railroad equipment. These businesses were in no way similar to the rail welding business engaged in by Holland. Moreover, in his report, Grabowski stated that these companies were also engaged in numerous other businesses in addition to the railroad supply business. The record, however, does not disclose the nature of these businesses. Consequently, we conclude that Grabowski's comparable companies were not essentially engaged in the same or similar line of business as Holland. We therefore reject his market comparable valuation of Holland. We do not, of course, question that Grabowski used the best "comparables" he could find. We simply find that the market comparable approach is not available in this case in the absence of more reliable yardsticks.

We are similarly unable to accept Lerner's use of a modified market comparable approach to value CCC and its subsidiaries. Because he was unable to locate publicly traded companies engaged in the same or similar lines of business as CCC and its subsidiaries, Lerner relied on publicly traded companies with financial statistics similar to those of CCC. In choosing these comparable companies, Lerner did not look at the particular businesses in which

they were engaged. Rather, he believed that investors would similarly value companies with comparable sales, returns on equity, and debt to equity ratios, regardless of the type of business in which they were engaged. We, however, are unable to agree with this theory.

It seems self-evident that every industry is characterized by its own peculiar risks and expectations. As a result, financial statistics which may be considered outstanding for one industry may be considered disastrous for another. For example, a large debt to equity ratio might be very acceptable to a willing buyer of stock in a company engaged in a business characterized by stable earnings while a similar debt to equity ratio might be unacceptable to that investor if the company were engaged in a business subject to volatile earnings. For the same reason, an investor cannot determine what constitutes a reasonable return on equity or adequate sales volume without considering the particular business of the company. We also point out that a company's total sales volume provides little evidence of the attractiveness of an investment in the absence of evidence of the company's overall profitability. Consequently, we do not believe that Lerner's modified market comparable approach provides an adequate indication of the intrinsic value of CCC and its subsidiaries.

On the record before us, we think that Grabowski's discounted cash-flow analysis provides a reasonable estimate of the intrinsic value of CCC, Stahl, Kaneland, and Holland. In Rev. Rul. 59-60, 1959-1 C.B. 237 (which is applied by both Grabowski and Lerner), it is stated that earnings are the most important factor to be considered in valuing stocks of manufacturing or service corporations. In this revenue ruling and the above-quoted estate and gift tax regulations, the following factors are listed as also relevant in determining stock values: (1) The economic outlook in general and the condition and outlook of the specific industry in general; (2) the financial condition of the business; and (3) its dividend-paying capacity. Because Grabowski's discounted cash-flow analysis takes into account all of these factors, we think that such analysis provides an appropriate method to use in valuing the common stock of CCC.

Grabowski's discounted cash-flow analysis is based upon the theory that the price which an investor will pay for a share of stock is equal to the present value of the future stream of income which he expects to receive from the investment. Thus, as applied here, this valuation method relies primarily on the earnings of CCC and its subsidiaries, which, as Rev. Rul. 59-60 itself provides, is the most important factor to consider in valuing manufacturing and service companies like CCC, Stahl, Kaneland, and Holland. Moreover, in projecting the future income stream of these companies, Grabowski considered general economic conditions as well as the condition of the construction industry and railroad supply industry, the companies' financial conditions and their dividend-paying capacity. Consequently, because Grabowski's discounted cash-flow analysis emphasizes the companies' past and future earnings as well as other relevant factors listed in respondent's regulations and revenue rulings, we think that this valuation method is an appropriate method to use in determining the intrinsic value of CCC, Stahl, Kaneland, and Holland.[22]

Respondent, nevertheless, attacks Grabowski's discounted cash-flow analysis on the ground that the projections of operating income are based on pure speculation. We demur. Rev. Rul. 59-60 states that:

Potential future income is a major factor in many valuations of closely-held stocks, and all information concerning past income which will be helpful in predicting the future should be secured. Prior earnings records usually are the most reliable guide as to the future expectancy, but resort to arbitrary five-or-ten-year averages without regard to current trends or future prospects will not produce a realistic valuation. If, for instance, a record of progressively increasing or decreasing net income is found, then greater weight may be accorded the most recent years' profits in estimating earning power. It will be helpful, in judging risk and the extent to which a business is a marginal operator, to consider

[22]In *Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del. 1983), the Delaware Supreme Court recognized the validity of the discounted cash-flow method in reversing a lower court's decision not to use the discounted cash-flow method in appraisal and other stock valuation proceedings. The court stated:

"the standard 'Delaware block' or weighted average method of valuation, formerly employed in appraisal and other stock valuation cases, shall no longer exclusively control such proceedings. We believe that a more liberal approach must include proof of value by any techniques or methods which are generally considered acceptable in the financial community and otherwise admissible in court * * *" [457 A.2d at 712-713.]

deductions from income and net income in terms of percentage of sales. * * * [1959-1 C.B. 237, 241.]

Thus, Rev. Rul. 59-60, itself, provides that potential future income is a major factor to consider in valuing the stock of a closely held corporation even though this factor cannot be established with certainty, but rather must be projected on the basis of prior earnings records. In the instant case, Grabowski made reasonable estimates of the future income of CCC, Stahl, Kaneland, and Holland based on their prior earnings. He also projected future expenses as a percentage of sales based on the companies' prior operating experience. Consequently, because projected future income is an essential factor to consider in valuing stock and because Grabowski's method of projecting future income satisfies the guidelines set forth in Rev. Rul. 59-60, we think that Grabowski's use of the discounted cash-flow method was appropriate in the instant case.

Respondent also attacks Grabowski's use of the Capital Asset Pricing Method (CAPM) to determine the cost of capital for CCC, Stahl, Kaneland, and Holland, maintaining that this formula is based on speculation and conjecture. We are, however, satisfied that the CAPM provides an acceptable formula to use in calculating the cost of capital for CCC and its subsidiaries.

The CAPM used by Grabowski is not based on unfounded speculation and conjecture, but rather requires the application of the appraiser's commonsense and informed judgment in weighing all the facts and circumstances in determining the cost of capital for a particular company. This approach to valuation is consistent with the statement in Rev. Rul. 59-60 that "A sound valuation will be based upon all the relevant facts, but the elements of common sense, informed judgment and reasonableness must enter into the process of weighing those facts and determining their aggregate significance." Indeed, we have repeatedly recognized that stock valuation is not an exact science, but rather is "inherently imprecise and capable of resolution only by a Solomon-like pronouncement." *Messing v. Commissioner*, 48 T.C. 502, 512 (1967). We also note that respondent's expert, Lerner, described the CAPM as a "formal statistical measure of risk" whose use has flowered since 1951. Although Lerner

further stated that the CAPM is presently on the wane because of the instability of the so-called "beta coefficient" (see below), he nevertheless also stated that numerous companies presently use the CAPM to estimate their cost of capital when making investment decisions.

Respondent also criticizes the CAPM on the ground that the appraiser's risk added by Grabowski is simply a different estimate of the same risk quantified by the beta coefficient. We disagree.

The beta coefficient is a ratio which compares the movement of stock prices for publicly traded companies deemed comparable to the company in issue with the movement of stock prices in general. In the instant case, had CCC been a large, publicly traded company, the beta coefficients relied on by Grabowski would have accurately reflected the company's perceived risk. However, because CCC is an unlisted, closely held corporation, an additional premium is needed to reflect the fact that investors view such corporations as being more risky than large, publicly traded companies. Thus, Grabowski's appraiser's risk reflects the additional risk inherent in CCC, Stahl, Kaneland, and Holland because they are unlisted closely held corporations.

In conclusion, after consideration of the entire record before us, we are satisfied that Grabowski's discounted cash-flow analysis accurately reflects the fair market value of the common equity of CCC, Stahl, Kaneland, and Holland before applying discounts for lack of control and lack of marketability. Consequently, based on Grabowski's discounted cash-flow analysis, we find that the total common equity of CCC had a value of $4,490,000 on the applicable valuation dates.

As to the remaining subsidiaries, Grabowski valued Suburban's real estate holdings and other assets, together with the investment real estate owned by CCC and Curran Development, at $2,665,000, which represented the liquidation value of those assets. Lerner, on the other hand, valued Suburban at $1,625,095, which represented the book value of its assets. Lerner did not individually value the investment real estate owned by CCC and Curran Development.

Although a company's liquidation value on occasion has been found to be an appropriate indication of that company's value (see *Estate of Lee v. Commissioner*, 69 T.C. 860 (1978)), on the record before us we find it more appropriate to rely on Lerner's valuation of Suburban based on the book value of its assets. At trial, Grabowski stated that a substantial portion of his liquidation value determination was based on the assessed value of Suburban's real estate holdings as adjusted to reflect fair market value. Grabowski explained that he relied on the opinion of several local real estate appraisers to properly adjust the properties' assessed values to reflect their fair market value. Grabowski admitted, however, that the appraisers never viewed the property prior to determining the appropriate adjustments. Indeed, the record contains no evidence explaining the basis of these adjustments. Section 20.2031-1(b), Estate Tax Regs., states that "Property shall not be returned at the value at which it is assessed for local tax purposes unless that value represents the fair market value as of the applicable valuation date."

We have recently held that assessed value may be considered when the relationship between assessed value and fair market value is demonstrated, but basically as a corroboration of fair market value determined by a more reliable method. *Estate of Kaplin v. Commissioner*, T.C. Memo. 1986-167. We apply this rule here. Since Grabowski has not shown the relationship between assessed value and fair market value, we think assessed values must be disregarded. We consequently rely on Suburban's book value of $1,625,095 as the fair market value of its stock.

Respondent, however, failed to provide any estimate of the fair market value of the real estate held by CCC and Curran Development. In the absence of other evidence indicative of the properties' value, we accept these properties' liquidation values as determined by Grabowski. Consequently, we find that the investment real estate owned by CCC and Curran Development had a fair market value of $415,000 on the applicable valuation dates.

For the reasons stated above, we conclude that the total fair market value of the common stock of CCC and its subsidiaries, before applying discounts for minority blocks

and lack of marketability, was $6,530,095 on the applicable valuation dates. Our calculations may be summarized as follows:

| | |
|---|---:|
| Curran, Stahl, Kaneland, and Holland | $4,490,000 |
| Suburban | 1,625,095 |
| Investment real estate | 415,000 |
| Total | 6,530,095 |

We must next allocate $6,530,095 between CCC's class A voting common stock and class B nonvoting common stock. Petitioners and respondent agree that because the blocks of class A voting common represent minority positions, the class A voting shares are not more valuable than the class B nonvoting shares. Both parties therefore agree upon a pro rata allocation between the two classes of common stock. Consequently, we find that each share of CCC's class A voting common stock and class B nonvoting common stock had a value of $707.95 before applying a minority position discount and discount for lack of marketability.[23]

We now reach the point upon which the parties most strongly disagree. We must determine the appropriate discounts to apply for lack of control and lack of marketability. Petitioners contend that each 25-percent block of CCC's class A and class B common stock should be discounted 35 percent for lack of control. Petitioners rely on a study conducted by one Douglas Austin to support this figure. (The Austin study is not part of the record and we have not been asked to take judicial notice of its existence or contents.) Petitioners also maintain that the value of the class A and class B shares should be further reduced by discounts of 20 percent and 90 percent, respectively, for lack of marketability. They contend that a willing buyer of one 25-percent block of class A stock would discount the stock by 20 percent because the remaining 75 percent of the class A stock will be held by irrevocable voting trusts with an actuarially determined duration of 97 years. Petitioners also contend that a willing buyer would discount the class A stock because of CCC's failure to pay dividends in the past. Petitioners further maintain that the difference in size between each 25-percent block of class A stock (6 shares)

[23]We determined this value as follows: total common equity of $6,530,095 divided by 9,224, the number of outstanding shares.

and each 25-percent block of class B stock (2,300 shares) supports their contention that the class B shares should be discounted 90 percent.

Respondent disagrees, maintaining that because CCC was a financially strong old-line company with excellent and aggressive management and the capacity to pay dividends, both classes of stock should be discounted by no more than 15 percent for lack of control and 20 percent for lack of marketability. Respondent contends that the restrictions on transferability placed on 75 percent of the outstanding shares of the class A and class B stock by the terms of the trusts should not be considered in determining the value of each 25-percent block of stock in issue. Respondent further argues that no additional discount should be applied to the class B shares based on the difference in size between each 25-percent block of the class A shares and the class B shares. After a careful review of the record, we think that a minority position discount of 25 percent and a discount of 20 percent for lack of marketability are appropriate for both classes of stock.

First, we point out that we can give little weight to Grabowski's reliance on the so-called Austin study, which is said to find that investors on average pay a premium of 35 percent in cash tender offers for stock representing a controlling interest in a company, to support a minority position discount of 35 percent in the instant case. The valuation of a closely held corporation, including the appropriate discount to apply to stock representing a minority position, must take into account all of the relevant facts and circumstances of the particular corporation under scrutiny. Grabowski, by relying on a study based on a sample of various corporations, has failed to consider the particular facts and circumstances a willing buyer would consider when discounting a block of stock representing a minority position in CCC.

We are similarly not convinced by respondent's assertion that a minority position discount of 15 percent is appropriate in this case. We do not think that this discount factor adequately reflects the amount a willing buyer would reduce the value of each 25-percent block of common stock for lack of control. Rather, based on all of the facts and circum-

stances contained in the record before us, we believe that a minority position discount of 25 percent would be appropriate in the instant case. In so holding, we have considered the fact that a purchaser of a 25-percent interest in CCC would not have sufficient voting power to elect members to CCC's board of directors and therefore would not be able to participate in the management of the company.[24] We have also considered, however, that under Delaware law, corporate officers and directors owe their corporation and its minority shareholders a fiduciary obligation of honesty, loyalty, good faith, and fairness. *Singer v. Magnavox Co.*, 380 A.2d 969, 977 (Del. 1977). Moreover, we point out that a willing buyer would be aware of the history of success experienced by CCC's past and present management and the dividend paying capacity of the company. Thus, although we believe that a potential investor would apply some discount to a 25-percent stock interest in CCC for lack of control, we do not think that his minority position would unduly deter a prospective investor from buying the 25-percent block of stock, given an appropriate discount in his purchase price.

Petitioners also contend that each 25-percent block of CCC's outstanding class B common stock must be discounted 90 percent for lack of marketability. They argue that a willing buyer of a 25-percent interest in the class B stock would discount that stock by 90 percent given the fact that the remaining 75 percent of the shares would be held in irrevocable trusts with an actuarially determined life of 97 years.

We agree with respondent that Grabowski's 90-percent discount figure is based upon a misconception of the law. In his testimony Grabowski stated:

Well, for example, valuing the Jack Curran block of stock I would be presented with the—I was presented with the necessity of placing myself as a hypothetical investor as of May 7, 1976, presented with the opportunity to buy this stock. Looking at the form I see a very good historically sound financially stable firm. I also see though that we have a situation of 18 other shares of Class A common stock being held by three other trusts, the trustees of which are Curran Management. I also see 2,300 shares of Class B common stock held in another similar trust, two different trusts, Cecilia Simon's 76-2 trust, and for example, placing myself looking at the Jack Curran block of stock, Bill Simon's 76-2 trust.

So I could—I would analyze what are the types of returns that I might anticipate at that point buying a block of six shares of common stock that provides some—the opportunity to vote, and 2,300 shares of Class B common stock not providing the opportunity to vote. Given this circumstance that the other shares are housed in these trusts, given that, I would have to look at well, what are the likely scenarios, or what are the likely returns I might receive from making this investment.

Grabowski was viewing each block of stock as a separate gift on the one hand and hypothetically valuing each block before the gift. On the other hand, he was assuming that the other gifts were a fait accompli. Grabowski perceived the trusts as a restriction on the stock when in fact the trusts were not in existence until the making of the gifts. The trusts were, of course, created simultaneously and in concert by the stockholders pursuant to the estate freeze plan. Respondent's expert, Lerner, with whom we agree on this point, considered the trusts irrelevant for valuation purposes because he looked at the value of the stock from the point of view of what the donor had given.

Section 2511(a) states that the gift tax shall apply whether the transfer is in trust or otherwise, whether the gift is direct or indirect, and whether the property is real or personal, tangible or intangible. Section 25.2511-1(a), Gift Tax Regs., explains further that the gift tax is an excise tax on the transfer, and is not a tax on the subject of the gift. Section 25.2511-2(a), Gift Tax Regs. (entitled "Cessation of donor's dominion and control"), provides:

The gift tax is not imposed upon the receipt of the property by the donee, nor is it necessarily determined by the measure of enrichment resulting to the donee from the transfer, nor is it conditioned upon ability to identify the donee at the time of the transfer. On the contrary, the tax is a primary and personal liability of the donor, is an excise upon his act of making the transfer, *is measured by the value of the property passing from the donor*, and attaches regardless of the fact that the identity of the donee may not then be known or ascertainable. [Emphasis supplied.]

With respect to the critical date for valuation purposes, section 2512 states that if the gift is made in property, the value thereof as the date of the gift shall be considered the amount of the gift. Section 25.2512-2(a) of the regulations addresses the method for determining the value of stocks and bonds. It states that the value of the stocks and bonds is the fair market value per share on the date of the gift.

*Ahmanson Foundation v. United States*, 674 F.2d 761 (9th Cir. 1981), addressed this issue in the estate tax context. The court was faced with the question of the valuation of stock includable in the decedent's gross estate at his death. The taxpayer had argued that shares of stock should be partitioned into two blocks prior to valuation, that the 99 shares which went to a charitable foundation should be valued separately from the 1 share which had a private destination. The taxpayer argued that because the estate tax is a tax on the transfer of property, the valuation of the property in the gross estate must take into account any changes in value brought about by the fact of the distribution itself. The court acknowledged that valuation may take into account changes brought about by the death of the testator. Usually death itself does not alter the value of property owned by the decedent, although in exceptional cases, such as when a small business loses the services of a valuable partner, death does change the value of property. See *United States v. Land*, 303 F.2d 170 (5th Cir. 1962). The court in *Ahmanson* stated:

> We must distinguish, however, the effect of "predistribution" transformations and changes in value brought about by the testator's death, from changes in value resulting from the fact that under the decedent's estate plan the assets in the gross estate ultimately come to rest in the hands of different beneficiaries. The estate tax is a tax upon a transfer as the Foundation contends. However, *it is a tax on the privilege of passing on property, not a tax on the privilege of receiving property.* * * * [*Ahmanson Foundation v. United States, supra* at 768. Emphasis supplied.]

In *Ahmanson*, the court concluded that a hypothetical bifurcation of stock would be contrary to the policy underlying the Federal estate tax. This is because it would be easy to implement a tax avoidance scheme whenever an asset in the gross estate would have a diminished value if divided among two or more beneficiaries.

Citing *Ahmanson* with approval, the Seventh Circuit Court of Appeals, in *Estate of Curry v. United States*, dealt with the post-transfer bifurcation theory in the following language:

> to permit the hypothetical bifurcation of an otherwise integrated bundle of property for valuation purposes would severely undermine the estate

tax system and permit abusive manipulation by inviting an executor to invent elaborate scenarios of disaggregated disposition in order to minimize total value. For example, an estate in possession of all shares of a corporation, voting and non-voting, could, under the regime urged by the estate here, arbitrarily slice the voting share block so thinly as to deny attribution of a control premium to any resulting block. * * * [*Estate of Curry v. United States*, 706 F.2d 1424, 1428 (7th Cir. 1983).]

See also *Estate of Pudim v. Commissioner*, T.C. Memo. 1982-606, affd. without published opinion 742 F.2d 1433 (2d Cir. 1983).

We think the anti-bifurcation rationale explained in the estate tax context by the Seventh Circuit in *Estate of Curry* and by the Ninth Circuit in *Ahmanson Foundation* applies equally here in the gift tax context. The estate tax and the gift tax, both being excise taxes on transfers, are to be construed in pari materia. *Sanford's Estate v. Commissioner*, 308 U.S. 39, 44 (1939); *Carson v. Commissioner*, 71 T.C. 252 (1978), affd. 641 F.2d 864 (10th Cir. 1981). This case presents a paradigmatic example of the appropriateness of that rule of construction.

Given petitioners' concerted estate freeze plan put in place by the simultaneous gifts in trust, we find their attempt to discredit respondent's reliance on *Estate of Curry* and *Ahmanson Foundation* to be, with all due respect, disingenuous. Petitioners attempt to draw a distinction based upon the fact that the two cited cases involved the stock of a single majority stockholder, whereas here none were in control. In the context of this case, this is a distinction without a difference, because even petitioners cannot deny that in creating the estate freeze plan they marched in lockstep. So marching, their position was no different than that of a single majority stockholder.

After a careful review of all relevant facts and circumstances, we also find a discount of 20 percent for lack of marketability for both classes of common stock to be appropriate. In determining this discount factor, we recognize that the stock of unlisted, closely held corporations is generally difficult to sell. We also recognize that CCC had a history of paying little if any dividends. We believe, however, that these negative factors are substantially offset by the following positive factors: (1) The Curran companies had a stable or upward trend in earnings during the 5-year

period 1971 through 1975, which trend was expected to continue in the future; (2) CCC was financially strong with excellent and aggressive management; and (3) CCC had a substantial dividend-paying capacity.

In conclusion, after applying a minority position discount of 25 percent and a discount of 20 percent for lack of marketability, we find that each share of CCC's class A voting common stock and class B nonvoting common stock had a value of $389.37.

To reflect the foregoing,

*Decisions will be entered under Rule 155.*