ESTATE OF GLADYS H. TITUS, DECEASED, JOAN T. SWAN, PERSONAL REPRESENTATIVE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Titus v. Commissioner
Docket No. 4886-87
United States Tax Court
T.C. Memo 1989-466; 1989 Tax Ct. Memo LEXIS 466; 57 T.C.M. (CCH) 1449; T.C.M. (RIA) 89466; August 29, 1989
Larry R. Baumann and Donald H. Kelly, for the petitioner. Dennis R. Onnen, for the respondent. GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: Respondent determined a $ 449,920 estate tax deficiency which is largely attributable to the valuation of 2,148 shares in *467 a one-bank holding company as of April 18, 1983, the date of decedent's death. In this opinion we determine the fair market value of those shares. FINDINGS OF FACT The parties stipulated facts and exhibits which are incorporated by this reference. Decedent, Gladys H. Titus, a resident of Holdrege, Phelps County, Nebraska, died on April 18, 1983. Decedent was 89 years old at the time of her death. At the time of the filing of the petition, the estate's personal representative, Joan T. Swan, resided in Hastings, Nebraska. A timely estate tax return was filed reporting 2,148 shares of First Holdrege Bancshares, Inc. (FHB), which the estate valued at $ 342.79 per share. At the time of decedent's death there were 9,950 shares of FHB outstanding, and FHB owned 99.1 percent of the issued and outstanding common stock of First National Bank of Holdrege (Bank). Respondent, in the notice of estate tax deficiency, determined that the FHB shares had a value of $ 806.29 per share. Subsequently, respondent conceded that the fair market value of FHB shares should be $ 556.00 per share. Bank is located in Holdrege, Nebraska, a predominantly agricultural area distant from the more populated *468 cities of Lincoln and Omaha, Nebraska. As of April 18, 1983, Holdrege, Nebraska, had a population of less than 6,000 people and Bank's total assets exceeded $ 100,000,000. Bank was organized in 1884 and has been under the management and control of L. J. "Liscomb" Titus and his descendants since 1893. As of April 18, 1983, decedent owned 21.6 percent (2,148 divided by 9,950) of FHB's outstanding shares. The combined holdings of decedent's immediate family was 30.8 percent on the date of death. L. J. Titus and his immediate family owned 34.7 percent, Dorothy Johnson and her immediate family owned 26 percent, and the remaining 8.5 percent was owned by other individuals. During March 1979, decedent's immediate family attempted to formulate a cooperative FHB control group with the Dorothy Johnson family, but decedent's family's efforts were unsuccessful. There were no outstanding agreements restricting or controlling the purchase or sale of FHB shares. FHB's shares were not traded on any public market. At the time of decedent's death, FHB was not required to purchase the decedent's shares if tendered. There was only one negotiated sale of FHB shares near April 18, 1983. On October 13, 1982, FHB *469 purchased 50 shares of its stock from George E. Hoppe for a price of $ 588.51 per share. The purchase was approved at a board of directors meeting of September 14, 1982, and the purchase price was established at 75 percent of unadjusted or stated book value on June 30, 1982. There were also inter-family transfers of FHB shares on June 27 and August 1, 1983, and June 25, 1984, for prices ranging from $ 300 to $ 420 per share. There were 11 sales of FHB shares between December 7, 1983, and May 2, 1985, for amounts approximating historical or stated book value. Most, if not all, of these sales appear to have been between family members and/or corporate officers. The date, number of shares, and price per share are as follows: Date
Number of Shares
Price Per Share
12-07-83
5
$   940
12-07-83
11
940
12-20-83
13
940
12-20-83
5
940
01-10-84
8
1,000
12-24-84
10
1,000
12-24-84
5
1,000
12-24-84
5
1,000
01-15-85
10
1,000
01-15-85
10
1,000
05-02-85
30
1,000
FHB had the following calendar year balance sheet items (in thousands) and book values for the years 1983 back through *470 1979: 1983
1982
1981
1980
1979
Assets
$ 9,389
$ 8,714
$ 7,762
$ 6,466
$ 5,391
Liabilities
199
- 0 -
595
750
917
Equity
9,190
8,714
7,167
5,716
4,474
Book Value
$ 923.65
$ 875.76
$ 716.68
$ 571.56
$ 447.45
FHB's book values on December 31, 1984 and 1985, were $ 1,018.70 and $ 1,100.46, respectively. FHB's net income for the 4 fiscal years preceding and 3 fiscal years after April 18, 1983, was as follows: Amount of
Net Income
Dividend
Year
Net Income
Per Share
Declared
1986
$  (259,329)
$ (26.06)
$ 40
1985
1,211,464   121.75 40
1984
1,343,737 135.05 40
1983
974,060 97.90 40
1982
1,776,408 178.53 20
1981
1,551,231 155.90 10
1980
1,401,094 140.81 16
1979
814,556 81.86 14 Bank was required to maintain a minimum primary capital to assets ratio of 6 percent by the Comptroller of the Currency at the time of decedent's death. Bank's primary capital to assets ratios for 1982 and 1983 were 8.89 and 9.26 percent, respectively. The balance of Bank's reserve for bad debts and its write-off *471 of net loan losses for 1979 through 1986 are as follows: Reserve for
Net Loan
Year
Bad Debts
Write-offs
1979
$   423,000  $     7,000
1980
423,000  - 0 -   1981
405,000  142,000
1982
466,000  148,000
1983
870,000  43,000
1984
1,050,000  786,000
1985
928,000  1,935,000
1986
947,000  4,145,000
The "historical cost" balance sheets of Bank and FHB, as of April 18, 1983, were as follows: First National Bank - Holdrege
Assets
Cash
$     670,151 Due from banks
2,768,845 U.S. Treasury securities
999,476 U.S. agencies
18,911,035 Municipal bonds
12,418,028 Warrants
2,992,372 Federal Reserve stock
90,000 Gross loans
63,601,071 Lease unearned income
(134,231)
Interest collected not earned
(80,422)
Reserve for bad debts
(786,840)
Land
133,845 Bank building
1,345,211 Accumulated depreciation
(616,409)
Cabin
41,974 Accumulated depreciation
(36,345)
Furniture and fixtures
627,640 Accumulated depreciation
(357,831)
Interest earned uncollected
2,700,931 Residual value - lease
36,513 Interest earned uncollected lease
1,751 Suspense
118 Total Assets
$ 105,326,883 Liabilities and Stockholders' Equity
Demand deposit accounts
$  18,185,923 Time certificates of deposit
59,697,236 Savings accounts
15,156,347 Official checks
214,404 Interest payable
910,304 Accrued expenses
124,000 Accrued income taxes and deferred
income taxes payable
1,165,731 Suspense credits
(100)
Federal funds purchased
975,000 Capital stock
1,500,000 Surplus
1,500,000 Undivided profits
5,609,434 Current year earnings
288,604 Total Liabilities and
Shareholders' Equity
$ 105,326,883 *472 First Holdrege Bancshares, Inc.
Assets
Cash
$     3,610 Investment in subsidiary
8,609,435 Organization costs
853 Total Assets
$ 8,613,898 Equity
Common stock
$ 1,000,000 Additional paid-in capital
2,801,010 Retained earnings
4,842,314 Treasury stock (50 shares)
(29,426)
Total Equity
$ 8,613,898 In the process of examination by bank examiners from the Comptroller of the Currency, reports were issued to Bank in December 1982 requiring the charge-off of about $ 746,000 of the portfolio of warrants and about $ 371,000 attributable to Washington Public Power Supply System bonds. Those amounts were written off by Bank during 1983. Bank's outstanding loans were substantially agricultural, approaching 80 percent of all loans. As of April 18, 1983, Bank had an "aggressive" bond and warrant portfolio. The warrants in the portfolio generally related to a limited market where the seller of the warrant would be the only potential buyer. Although small numbers of warrants would be relatively easy to sell, large quantities would limit the possibility of sale and tend to depress *473 the potential sales price. The warrants generally did not pay interest until maturity and were speculative. Bank's bond portfolio was generally of lower grade bonds of the type sometimes called "junk bonds." Interest rates reached a peak in 1982 and began a downward trend in 1983. This situation could cause the issuer to redeem the bonds before maturity, which obviated or mitigated the higher interest rates for which a premium may have been paid. These factors caused the value of Bank's bonds and warrants to be lower than the amount shown on the balance sheet reflecting book values at the date of death. Bank's profits in 1982 and earlier years had been on the increase. In 1982 and continuing into 1983, Bank was beginning to experience portfolio difficulties from an area economy that was feeling the strain of a period of high interest rates and poor farm prices. This ultimately caused a number of bank failures throughout the state of Nebraska, and by mid year 1983, nonperforming loans had jumped to 3 percent of loans and Bank was faced with a growing volume of repossessed real estate in the face of declining property values. Respondent offered M. J. Swords (Swords) as an expert *474 who opined that FHB shares had a value of $ 556 per share on April 18, 1983. Swords has a graduate level degree in banking from Rutgers University. Since 1954, Swords has been involved in banking and he has worked for the Federal Reserve Bank of Kansas City in successively higher positions ranging from bank examiner to vice president in charge of bank examinations. In 1970, Swords left the Federal Reserve and became vice president of administration for First Union Bancorp, St. Louis, Missouri, a multi-bank registered bank holding company. In 1973, Swords began a bank consulting business specializing in bank acquisition planning, bank sales and appraisals for banks, and bank holding companies. Swords has appraised bank stock on numerous occasions. Swords based his appraisal opinion of $ 556 per share on a weighted index consisting of the following factors: (1) 20 percent -- adjusted book value; (2) 30 percent -- comparable book value; and (3) 50 percent -- comparable earnings value. In arriving at "adjusted book value," Swords began with FHB's equity capital of $ 8,614,000 and reduced it by $ 2,438,000 for unrecognized loan losses and $ 1,115,000 for market losses in the Bank's *475 bond and warrant accounts. He then added a "tax benefit" of $ 1,777,000 attributable to potentially claimable losses to arrive at an adjusted book value of $ 6,838,000, which when divided by the 9,950 outstanding shares resulted in a $ 687.24 per share adjusted book value, compared to a $ 865.73 ($ 8,614,000 divided by 9,950) unadjusted book value on April 18, 1983. Swords reduced or adjusted the book value based upon his analysis of actual events and what he believed a willing buyer would have considered. Swords believed that "in early 1983 economic conditions in Nebraska were causing * * * loans at above-market values and falling income levels were beginning to cause an overall dilution in farm related industry values." He also noted the economic forecast indicating "future trouble with crop and livestock prices." In spite of the economic forecasts and deteriorating conditions in the "farm belt," Swords tempered his reductions because "major banks in Lincoln and Omaha * * * [had their trading prices rising for 1983] 12 per cent over 1982 year-end on their way to a 47 per cent total gain for the year." Comparable book value of $ 515.88 was derived by taking Bank's assets, *476 reduced for net loan and security losses, as above, and using average base equity and price/earnings ratios in the Nebraska market to adjust value. Finally, Swords arrived at a $ 732.82 "comparable earnings value" by utilizing regionalized Nebraska and an Omaha and Lincoln banks' average base earnings and price earnings ratios to arrive at a comparable earnings price for the shares in issue. The conglomerated and indexed appraisal value was then computed, as follows: Method of valuation
Amount
Index Percent
4/18/83 Value
Adjusted Book Value
$ 687.24
20
$ 137.45 Comparable Book Value
515.88
30
154.76 Comparable Earnings
Value
723.82
50
361.91 Primary market value
100
654.12 15 Percent marketability discount
(98.12)
Swords' Opinion Value
$ 556.00 Price/adjusted book value
.81  Price historical bank earnings
($ 136/151 at sh.)
4.10  Dividend yield ($ 40 at sh.)
7.20  Swords' appraisal did not account for a larger paper loss calculated by petitioner's expert on the Bank's bond and warrant portfolio. Instead, *477 Swords used $ 1,115,000 actual write-off because Swords "thought that [the bond values on the books] looked like what the value was at that time" and because Bank was not going to have to take a loss until maturity or until the bonds were sold. Swords also minimized the effect of the $ 1,115,000 write-off, theorizing that a 50-percent state and Federal tax benefit would be generated by the loss recognized. Petitioner offered David A. Roehr (Roehr) as an expert and he has opined in a September 22, 1983, report that the FHB shares had a value of $ 342.79 on April 18, 1983. In a supplemental report dated April 7, 1988, Roehr opined that the value should be revised to $ 312.02 per share on April 18, 1983. Roehr is a tax partner in Grant Thornton, an international accounting and management consulting firm with 4,000 employees and 1,000 partners and managers. Roehr has been a certified public accountant for over 9 years and has earned a master's degree in taxation from the University of Denver. Although Roehr does not hold himself out as an "appraiser," his financial accounting background with banks and other businesses is sufficient expertise to assist the Court in valuing a closely *478 held business. Roehr's bank-related experience has involved 30 to 40 banks concerning auditing, tax work, buy-sell situations, and applications to the Comptroller of the Currency. Roehr based his $ 342.79 opinion value upon a weighted index of three factors, as follows: (1) 20 percent of book value formula; (2) 50 percent of earnings formula; and (3) 30 percent of dividend formula. In arriving at an adjusted book value Roehr made the following adjustments to the amounts reported in the books: (1) Based upon the Comptroller of the Currency's report, Bank's warrants were classified as follows: (a) Loss $ 746,450; (b) doubtful $ 352,000; and (c) substandard $ 975,000. Roehr wrote off 100 percent, 50 percent and 25 percent of the "loss," "doubtful," and "substandard" warrants, respectively. (2) Bonds were reduced $ 1,134,680 based upon Dean, Witter Reynolds appraisal and a value provided by the Comptroller of the Currency with respect to Washington Public Power Supply System bonds. Like Swords, Roehr reduced the income tax liability by 50 percent of the loss which would generate state and Federal tax benefits. Based upon these adjustments and some other minor adjustments, Roehr *479 arrived at an adjusted book value of $ 781.60. Using a 20-percent capitalization factor, Roehr arrived at $ 584.55 as the per share value based upon earnings capacity. Roehr used the actual earnings for 1979, 1980, 1981, and 1982. With respect to the short period in 1983 until decedent's death, earnings were projected for an annual period based upon earnings until the date of death. The projected earnings were reduced by the Washington Public Power Supply System bonds and warrants classified as a "loss" by the Comptroller of the Currency and increased by the amount of the 50-percent tax benefit from any such theoretical loss. Using a 5-percent capitalization factor, 5 years of historical earnings were weighted to emphasize most current earnings or dividends which, per Roehr, would have been reduced for the bonds and warrants classified as a "loss." This weighted method, after considering adjustments to 1983 projected earnings and losses, resulted in a dividend formula value of $ 409.05. The conglomerated and indexed appraisal value was then computed, as follows: Appraisal Method
Amount
Index Percent
4/18/83 Value
Earnings formula
$ 584.55
50
$ 292.28
Book value formula
781.60
20
156.32
Dividend formula
409.05
30
122.72
Primary Mkt. Value
100
571.32 Marketability discount-40 percent
228.53 Roehr's opinion value
$ 342.79 *480 A supplemental report by Roehr, dated April 7, 1988, contained the opinion that the $ 342.79 value per share reported on the estate tax return was too high. In the supplemental opinion, further reduction of the warrant value was urged because of actual write-offs that subsequently occurred. Similarly, additional loan losses which subsequently occurred prompted Roehr to suggest additional reduction to the value of FHB shares. The factors considered by Roehr in recommending additional reductions in value from that reported on the estate tax return were not available to a "theoretical buyer or seller" on April 18, 1983. OPINION Property includable in a decedent's gross estate is generally included at its fair market value on the date of the decedent's death. Sec. 2031(a); [1]sec. 20.2031-1(b), Estate Tax Regs. Fair market value is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." Sec. 20.2031-1(b), Estate Tax Regs.; United States v. Cartwright, 411 U.S. 546, 551 (1973); *481 Estate of Hall v. Commissioner, 92 T.C. 312 (1989); Estate of Heckscher v. Commissioner, 63 T.C. 485, 490 (1975). The willing seller and buyer are hypothetical rather than specific individuals or entities. Estate of Bright v. United States, 658 F.2d 999, 1005-1006 (5th Cir. 1981). The determination of value is to be made as of the valuation date (in this case as of the date of death) and knowledge of future events that may have affected the value cannot be attributed to the hypothetical buyer or seller. Sec. 20.2031-1(b), Estate Tax Regs. Valuation of closely held stock that is not listed on an exchange is imprecise and each case must be decided on its own unique or particular facts. Hamm v. Commissioner, 325 F.2d 934, 938 (8th Cir. 1963), affg. a Memorandum Opinion *482 of this Court, cert. denied 377 U.S. 993 (1964); Messing v. Commissioner, 48 T.C. 502, 512 (1967). Actual arm's-length sales of unlisted stock within a reasonable time before or after the valuation date are the best criteria of market value. Estate of Andrews v. Commissioner, 79 T.C. 938, 940 (1982). In the absence of arm's-length sales, a good method of valuation is to consider the value of stock of comparable companies engaged in the same or a similar business and which are listed on an exchange. Sec. 2031(b); Estate of Hall v. Commissioner, supra.Unfortunately, in this case we are not able to make direct comparisons of FHB to any listed company. Although respondent has offered the First National Lincoln and Omaha National Banks as comparables, we find those particular banks to be sufficiently differently situated so as to limit their use for direct comparative value. The unique rural and agrarian setting and business emphasis of Bank does not permit us to focus upon comparatives offered by respondent as a dominant *483 or significant factor in the valuation of the FHB shares. Other factors to be considered are net worth, earning power, economic outlook, and the control of the business entity, if any, that the shares may provide. Sec. 25.2512-2(f), Gift Tax Regs.; Estate of Hall v. Commissioner, supra; Ward v. Commissioner, 87 T.C. 78 (1986); Northern Trust Co. v. Commissioner, 87 T.C. 349, 378-379 (1986), affd. sub nom. Citizens Bank & Trust Co. v. Commissioner, 839 F.2d 1249 (7th Cir. 1988); Estate of Andrews v. Commissioner, supra at 940. The probative weight to be given to each of these factors is dependent upon the facts of each case. Sec. 25.2512-2(f), Gift Tax Regs.; Estate of Andrews v. Commissioner, supra at 941. Petitioner bears the burden of showing that the value determined by respondent is in error. Rule 142(a); Estate of Whitt v. Commissioner, 751 F.2d 1548, 1556 (11th Cir. 1985), *484 affg. a Memorandum Opinion of this Court, cert. denied 474 U.S. 1005 (1985). The trier of fact is not bound by an expert's view or opinion, but may use them to assist in deciding upon a value. Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. a Memorandum Opinion of this Court, cert. denied 431 U.S. 938 (1977); Chiu v. Commissioner, 84 T.C. 722, 734 (1985). One expert may be persuasive on a particular element of valuation and another expert may be persuasive on another element. Parker v. Commissioner, 86 T.C. 547, 562 (1986). Consequently, we may adopt some and reject other portions of expert reports or views. Helvering v. National Grocery Co., 304 U.S. 282 (1938). Applying the above principles to the evidence in this record we make the following observations and findings: Economic outlook - April 18, 1983, was within a period of time following a several-year period of rising interest rates. Additionally, poor farm prices caused difficulties for the farming industry. *485 These two factors were among the major causes for banking problems in farm areas and ultimately caused bank failures in those areas. There was a growing volume of repossessed real estate and declining real property values. During December 1982, bank examiners recommended write-off's of and pointed to weaknesses in Bank's bond and warrant portfolio. Additionally, some of Bank's loans were considered substandard and write-offs were also recommended for them. The general conditions in the local farming communities and the banks that serviced them were ostensibly known to the public. A buyer interested in purchasing an interest in a bank that substantially depended upon the farming industry would have been able to discover the weaknesses in the portfolios and the loan accounts and would have been generally knowledgeable about economic conditions prior to investing. Although respondent's expert was cognizant of these conditions and opined that any buyer would consider them, he reduced the bonds, warrants, and loan receivable assets only by the amounts that were actually written off. Although we do not agree with the extent of petitioner's expert's reductions, we believe some additional *486 reduction would be appropriate in those assets. Valuation methodology - The parties' experts used similar methods and applied similar weighted index percentages to arrive at a composite valuation of FHB shares. Each used 50 percent for the earnings factor and 20 percent for the adjusted book value approach. For the remaining 30 percent, respondent's expert utilized "comparative book value" and petitioner's expert used "dividend value." Additionally, for the earnings factor, respondent's expert used a comparative method. In the end result the undiscounted values reached by the experts did not vary greatly. The major difference was caused by the amounts of minority and marketability discounts applied. (a) Adjusted book value - Roehr arrived at $ 781.60 [2] and Swords $ 687.24 for the April 18, 1983, adjusted book value of FHB shares. We agree more with Swords' adjusted book value and we would reduce the amount somewhat for some of the poor investments and loans. We agree with both experts in their use of 20 percent as their factor to weight the book value. The book value focuses upon the value of the entity in liquidation and that is clearly not an appropriate focus *487 in the setting of this case. Of the factors considered by the experts, book value is, by consensus, the least important. This principle is supported by holdings in analogous cases. See, e.g., Righter v. United States, 439 F.2d 1204, 1210 (Ct. Cl. 1971); Central Trust Co. v. United States, 305 F.2d 393, 411 (Ct. Cl. 1962). A buyer or investor would be more interested in the earning capacity or the business as a going concern. See, e.g., Ward v. Commissioner, supra at 102; Estate of Andrews v. Commissioner, supra at 945. Due to the 20-percent weighting of this factor, the differences between the parties' experts does not result in a pronounced effect upon the final valuation. *488 (b) Earnings - Roehr and Swords arrived at values of $ 584.55 and $ 732.82, respectively, based upon earnings. Roehr's report focused upon projected 1983 earnings and included reductions for the bonds and warrants classified as "loss" by the bank examiners. Roehr also de-emphasized the earnings from 1982 down to 1979 by giving them progressively less weight in his formula, i.e., 5/15 was assigned to 1983 and 1/15 to 1979. This approach resulted in a lower base figure because of the extraordinary reduction to 1983 and the "loss" write-offs. Roehr then used a 20-percent capitalization rate to reach his $ 584.55 figure. Roehr believed, and we concur, that a 5 times rate was appropriate for a small town bank, as opposed to the 15 percent or approximately 6 times rate being employed for publicly traded big city banks such as those used by respondent's expert. Swords, on the other hand, found Bank comparable to the publicly traded Lincoln and Omaha banks and utilized a rate more equivalent to the comparable banks and determined the rate by reference to a "Nebraska market/average price." Swords also deemphasized earnings in the same manner as Roehr, except that 1983 was not reduced *489 for the loss found by the bank examiners or potential for losses in the bond, warrants, and loan accounts. The major differences, therefore, lie in the amounts projected as Bank's 1983 earnings, which Roehr found to be $ 414,518 and Swords to be $ 975,000, and the variations in the experts' capitalization rates. Although we agree that the loan, bond, and warrant portfolios require some adjustment to the projected 1983 earnings for purposes of determining a value, we find that petitioner's expert has made too large an adjustment. It is also appropriate to reflect upon FHB's and Bank's earnings record. FHB's earnings were steadily rising during the period 1979 through 1982 and they had more than doubled from approximately $ 815,000 to $ 1,776,000, respectively. After the interest rates peaked in 1982 and the farm economy began to deteriorate, FHB's income dropped precipitously, in part due to losses from write-offs of "loss" items found by the bank examiners. We find that a buyer would have had sufficient doubt, on April 18, 1983, about the continuation of Bank's and FHB's increasing earnings performance from 1979 through 1982 and would not have expected it to continue during *490 and immediately after 1983. (c) Comparables - Respondent's expert utilized two publicly traded larger city (Omaha and Lincoln) banks as comparables in his third approach to determining both book and earnings values. We note that the Nebraska statewide average, as opposed to the two specific comparables used by Swords, would have produced a somewhat smaller value and the statewide average would also have accounted for rural as well as urban banks. As stated above, we do not find the comparables to be of much assistance in this case. The parties have not provided us with comparables which we find to be helpful in redetermining the value of the shares in issue. Dividends - FHB paid dividends ranging between $ 10 and $ 20 per share during the period 1979 through 1982. As of April 18, 1983, Bank's and accordingly FHB's 1983 annual earnings were as yet unknown and it would have been reasonable to predict that the dividends would remain at pre-1983 levels or lower because of the losses and conditions described above. Respondent's expert opined that "A $ 40 per share dividend would have been anticipated by the $ 20 per share first half payout * * *." The record is silent on *491 the declaration or payment date of any "$ 20 per share first half payout." Although dividends of $ 40 per share were declared for 1983 and dividends continued at that level for the next 4 years, that fact was not predictable on April 18, 1983. In his "dividend valuation," petitioner's expert utilized the annual dividend payment for 1979 through 1983 and used a weighted average placing more emphasis on 1983 and the least emphasis on 1979. Then petitioner's expert applied a 5-percent capitalization factor to arrive at a dividend value of $ 409.05. More significantly, the purchaser of a minority interest is at the whim of those in control in the process of establishing the dividend policy of the corporation. Accordingly, even where an entity has adequate earnings from which to pay generous dividends, a prospective minority interest investor is limited to historical analysis in considering the return upon his investment in the shares of a closely held corporation. Actual Sales - Respondent argues that an arm's-length sale occurred about 6 months prior to April 18, 1983. The transaction in question involved 50 shares of FHB exchanged for a price of $ 588.51 on October 13, 1982. *492 The shares were purchased by FHB pursuant to the September 14, 1982, approval of FHB's board of directors. This "sale" was set at 75 percent of book value on June 30, 1982, and respondent argues that it supports the valuation of Swords at $ 556. Respondent continues that 75 percent of book value at the date of death was $ 650 ($ 865.72 X .75), an amount which exceeded Swords' figure, but did not consider potential losses in bonds, warrants and loans of Bank. Petitioner, on the other hand, points out that: (1) The "sale" was to a "closely held family member"; (2) the minutes of the Board of Directors meeting of September 14, 1982, indicate the shares were being purchased as "treasury issue" and therefore all remaining shareholders participated pro rata irrespective of whether the shares were over- or underpriced; (3) the stock purchase agreement states that "the parties understand that the sale or transfer under this Agreement in no way distinguishes between a minority and majority interest in said holding company, and should not be construed as such in setting a value on said shares in the future;" and (4) the transaction took place more than 6 months prior to the date of death *493 and prior to the bank examiners' negative commentary. Moreover, petitioner points out that this is not a comparable sale because of the practical consideration that decedent had no way to cause FHB to purchase her shares and it is not a transaction with an unrelated third party. We find that the transaction for 50 shares was not an arm's-length purchase for the purpose of establishing a fair market value of the FHB shares. We note that several other transactions in FHB shares for book value were not advanced by either party as arm's length or comparables. Value without considering marketability or minority discounts - Without considering the marketability or minority discount, Roehr, in his September 22, 1983, opinion, sets forth a value of $ 571.32. Without considering the marketability discount, Swords, in his April 12, 1988, opinion, sets forth a value of $ 654.12. Taking into consideration Swords failure, in our opinion, to adjust for weaknesses in Bank's loan, bond and warrant accounts beyond the actual write-offs, the deteriorating condition of the farm industry, and the lack of an appropriate comparable, we find the FHB per share value, without considering a marketability *494 or minority discount, to be $ 633.42. Marketability and minority discount - Initially, petitioner's and respondent's experts utilized somewhat different approaches concerning discounts. Petitioner's expert utilized one discount of 40 percent for both marketability and minority discounts. Respondent's experts utilized a 15-percent discount for marketability only. Respondent contends that its expert's use of comparables of traded companies provides a built-in minority discount. We, however, have found that the comparables are not appropriate in this instance. Accordingly, we have, to some degree, adjusted for respondent's minority discount in our redetermination of a value without considering discounts. The shares of a corporation that represent a minority interest are usually worth less than a proportionate share of the value of the assets or 100 percent ownership. Ward v. Commissioner, 87 T.C. 78, 106 (1986); Estate of Andrews v. Commissioner, 79 T.C. 938, 953 (1982). The minority discount is recognized because the minority shareholder lacks control *495 over the general ability to cause the payment of dividends, compel liquidation, or effect corporate policy. Ward v. Commissioner, supra; Harwood v. Commissioner, 82 T.C. 239, 267 (1984), affd. without published opinion 786 F.2d 1174 (9th Cir. 1986). A marketability discount accounts for the lack of a ready market for shares in a closely held corporation. Ward v. Commissioner, supra at 106-107; Estate of Andrews v. Commissioner, supra at 953. When evaluating a marketability discount we should consider the corporation's dividend-paying history and its future dividend-paying capacity. Northern Trust Co. v. Commissioner, 87 T.C. 349, 388-389 (1986). In this case we are unable, with certainty, to determine what portion of petitioner's expert's 40-percent discount would be attributable to marketability and which portion would be attributable to the minority factor. Respondent, on the other hand has applied a 15-percent discount for marketability. Considering the strengths *496 and weaknesses of Bank as of April 18, 1983, we find that a 25-percent combined discount should be applied for marketability and the minority interest. Accordingly, a share of FHB, after considering the marketability and minority discounts, had a value of $ 475.06 on April 18, 1983. Decedent's 2,148 shares had a value of $ 1,020,428.88 ($ 475.06 x 2,148). To reflect the foregoing and concessions of the parties, Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect on Apr. 18, 1983, the date of decedent's death, and all rule references are to this Court's Rules of Practice and Procedure.↩
2. In a supplemental report, dated Apr. 7, 1988, Roehr substantially reduced adjusted book value to $ 450.17, derived by discounting a $ 865.72 value by 52 percent. We have afforded the Apr. 7, 1988, supplemental report little weight because of the extensive use of hindsight based upon information which clearly would not have been available to a buyer or seller on Apr. 18, 1983.↩